Thomas A. MOTTO, Jr., Plaintiff,

v.

The GENERAL SERVICES ADMINISTRATION OF the UNITED STATES of America et al., Defendants.

Civ. A. No. 70–1865.

United States District Court, E. D. Louisiana, New Orleans Division.

Dec. 6, 1971.

Neal D. Hobson, New Orleans, La., for plaintiff.

Don M. Richard, Asst. U. S. Atty., for defendants.

ALVIN B. RUBIN, District Judge:

Thomas A. Motto, Jr. had been employed in New Orleans by the General Services Administration for nine years when he was notified he was transferred to Fort Worth. Rather than accept the transfer, he resigned. He contends that his transfer was an adverse action, and that he was entitled to notice and -a hearing. His transfer without a hearing, he contends, forced him out of government service, and he seeks reinstate-ment, with back pay, and other benefits that he lost when he resigned. The United States contends that Motto's transfer was to meet the needs of his employer, and did not constitute adverse action entitling him to a hearing.

It is unnecessary to plumb the depths of all the issues tendered by the parties. While the evidence was contradictory, I find the facts to be as follows:

Motto was a Civil Service employee. He had served in World War II and the Korean War and was entitled to the protection of the Veterans Preference Act, 5 U.S.C.A. §§ 2108, 3501 et seq. See also 5 U.S.C.A. § 3307 et seq. and 5 U. S.C.A. § 7511. His performance evaluation sheets indicate that his work had always been considered average or above average.

Whether Mr. Motto was a supervisor, as he contends, or merely a working job leader, as contended by GSA, several people were under his supervision in New Orleans. There had been a degree of turnover in his staff that his superior considered excessive and there had been some complaints about his supervisory ability. In the latter part of 1966, his supervisor was alerted to an approaching inspection of the New Orleans and Ft. Worth offices. He therefore came from Ft. Worth to inspect the New Orleans office himself, to attempt to make certain that the offices would obtain satisfactory reports.

Because of dissatisfaction with Motto's services, Motto's supervisor decided to get rid of Motto. If he attempted to discharge Motto because of inadequate performance, Motto would be entitled to a hearing, and the evidence was not sufficient to indicate that the charges would succeed. But Motto's supervisor knew that he had twice before refused transfers from New Orleans. While some of Motto's personal circumstances had changed in the interim, his superior knew that Motto would likely again decline a transfer unless he were offered a concurrent increase in pay. Therefore, the supervisor decided to order a trans-

fer to Ft. Worth, without a pay increase.

Motto's supervisor conferred with personnel officers about how to achieve his goals. They prepared a draft of a letter stating that Motto was being transferred because of "your inability to supervise people" and because of "your excessively high rate of turnover." (Motto Ex. 13).

But a transfer on these grounds might create a factual issue concerning Motto's supervisory ability and also might be considered adverse action. On the other hand, a transfer for "operational reasons" could not be questioned. Therefore, Motto was ordered to move to Ft. Worth because of job requirements.

As expected, Motto decided he would not accept the transfer. He was informed that he could instead resign, and he did.

In fact, Motto's services were needed in New Orleans, not in Ft. Worth, at the time his transfer was ordered. Indeed, his supervisor's own report, dated December 12, 1966, indicated that he then foresaw the need for an additional employee in New Orleans. While he testified that the work load in New Orleans was not increasing, or indeed, was declining, the report he requested from the Federal Supply Service, the agency that supplied the work being done by GSA's office, indicated that their work load had increased substantially and was then expected to remain at the higher level indefinitely.

As soon as Motto resigned, a new employee was hired in Ft. Worth supposedly to replace him. But, while Motto was classified GS 8, the new employee was classified GS 9. Explanations are found for this: the new employee had special qualifications, he was hired three months later, he had been a GS 10 and took a reduction to come to Ft. Worth.

But nothing in all of this rationalization explains why Mr. Motto could not have been offered the new position. In fact it is possible, although the evidence is not clear, that the new employee had

been interviewed and was under consideration when Motto was presented with his dilemma by his supervisor. GSA correspondence shows that the new employee was "hired to fill the vacancy . . . created by the retirement" of Motto, and this letter is dated March 24, 1967 only eight weeks after Motto resigned.

Nor is the superior able to explain why Motto was not afforded the benefit of the administrative policy: "Employees who are moved from one geographical location to another . . . will be given promotions to the maximum extent possible, subject to the availability of vacancies and pursuant to manpower requirements." Administrative Procedure Manual, Chp. 2–39 p. 30 (ADM P1000.2A Chge 11) April 7, 1970. There is no satisfactory explanation why Motto's subordinate in New Orleans was promoted to GS 7 in July, 1967, a few months after it was apparently learned that there was less need for that office. Indeed in March, 1967, it was recommended in an investigation of the New Orleans office that the permanent position formerly held by Motto, and then in Ft. Worth by the employee hired to replace him, be returned to the New Orleans office. While this was never done, it does create substantial doubt about the supposed need to transfer Motto's job to Texas.

■ Motto contends his transfer was an adverse action, 5 U.S.C.A. § 7512, entailing an elimination of supervisory status, hence a reduction in rank, and he was entitled to written notice and a hearing. 5 U.S.C.A. § 7512(b). Whether or not he was a supervisor, Motto's transfer was ordered because he was considered an undesirable employee, and to induce his resignation. Hence it was an adverse action even if it entailed no reduction in rank. Cf. Kletschka v. Driver, 2 Cir. 1969, 411 F.2d 436, at 444–445.

This is not a case where a genuine operational need of an agency required the agency to give an employee a job that he considered inherently unpleasant.

"The fact that the employee may be faced with an inherently unpleasant situation, or that his choice may be limited to two unpleasant alternatives, does not, per se, make the resulting action an involuntary action."

Federal Personnel Manual, 762–1, p. 25. Here Motto's supervisor devised the "inherently unpleasant situation" as a way to get rid of Motto.

Unlike the situation in Paroczay v. Hodges, D.C.D.C., 219 F.Supp. 89, rev'd, 1961, 111 U.S.App.D.C. 362, 297 F.2d 439, an immediate resignation was not demanded. But, as the court said in a footnote to that decision, the ultimate issue is whether the resignation was in fact coerced. *Id.* at 441.

■■ A discretionary decision by an administrative official authorized to make the decision should not be overturned by the courts unless that decision was arbitrary or capricious. Hoppe v. United States, 1956, 136 Ct.Cl. 559, see Kletschka v. Driver, 2 Cir. 1969, 411 F. 2d 436. And an employee may be given a fair choice between facing charges or resigning. Rich v. Mitchell, 1959, 106 U.S.App.D.C. 343, 273 F.2d 78. But if it is shown that a decision was made to rid the government of an employee without complying with the statute, the action may not be camouflaged as a discretionary decision to relocate the place where a function is performed. Transfer, like other government action affecting an employee's status, may not be based on "an arbitrary decision to achieve a predetermined result." Bright v. Macy, D. Maryland, 1967, 278 F.Supp. 215, 220.

GSA would read the issues narrowly. But the statute, the regulations, and the federal administrative policies are not mere cant. They reflect a national policy designed to protect government employees from arbitrary action. To those who work for the largest employer in the free world these policies afford a fundamental protection against the caprice or tyranny of a supervisor who might otherwise control the events of an employee's life. Hence, government procedures may not be manipulated by using literal compliance to achieve a prohibited result.

■ If Motto was an unsatisfactory employee, he should have been faced with the charge that he was, and given an opportunity to defend himself. If his transfer was to discipline him for improper work performance, he should have been notified of the reasons for it and afforded a hearing.

"It was to guard against the danger of arbitrary treatment of personnel, without a fair opportunity being given the employee to refute whatever charges have been levied against him, that Congress guaranteed the right to a hearing before any disciplinary action could be taken. If this salutary procedural safeguard can be evaded merely by ordering a transfer, with no reasons being given for such action, then § 4110 would mean very little indeed. Disciplinary action by any name requires for its legitimization a full hearing under § 4110." Kletschka v. Driver, 2d Cir. 1969, 411 F.2d 436, 446.

Here as there, Motto would have been "entitled to introduce proof establishing that his transfer falls within the disciplinary classification, and, if he can so prove, he is entitled to appropriate declaratory and injunctive relief." Id. There is no reason why GSA, or any government agency, should be required to provide lifelong employment on his own terms to an employee who does not do a satisfactory job, either because of his work results or his personality. But neither should any supervisor be permitted to make his own subjective determination that an employee is undesirable, and set out to achieve that person's separation from service by a calculated series of actions designed to force his resignation.

For these reasons, judgment will be rendered in favor of the plaintiff. Plaintiff's counsel will prepare a form of judgment, and submit it to opposing

counsel for review. If there is any objection to the proposed form of judgment that the parties cannot reconcile, their difference will be submitted to the court.

This opinion serves in lieu of formal findings of fact and conclusions of law.