B. Riley McCLELLAND, Appellant,

v.

Cecil D. ANDRUS, Secretary of the Interior, et al.

No. 76–1654.

United States Court of Appeals, District of Columbia Circuit.

Argued March 27, 1979.

Decided Aug. 17, 1979.

---

James R. Rosa, Washington, D. C., for appellant. Raymond J. Malloy, Washington, D. C., was on the brief for appellant.

Mary C. Lawton, Atty., Dept. of Justice, Washington, D. C., with whom Earl J. Silbert, U.S. Atty. at the time the brief was filed, and John A. Terry and Eric B. Marcy, Asst. U.S. Attys., Washington, D. C., were on the brief, for appellees.

Before WRIGHT, Chief Judge, and SWYGERT * and ROBB, Circuit Judges.

Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.

Dissenting opinion filed by Circuit Judge ROBB.

J. SKELLY WRIGHT, Chief Judge:

After exhausting his administrative remedies appellant, a former employee of the National Park Service, sued in the District Court for restoration of his job with retroactive back pay and other benefits. He challenged on the merits the action of the Civil Service Commission's Appeals Review Board (ARB) upholding the decision of the National Park Service to remove him from the Service. He also challenged appellees' refusal to provide him with a copy of a report on the personnel management practices of appellant's supervisor at Glacier National Park for use in the administrative proceedings resulting in his discharge. The study, which resulted in the report, was recommended by the Department of Interior Administrative Law Judge (ALJ) who first heard his case. The District Court upheld appellees' refusal to produce the report and granted summary judgment for appellees on the merits.

## I

The facts in this case are substantially undisputed.[1] From 1956 to 1973 B. Riley McClelland, appellant, a professional ecolo-

---

* Of the Seventh Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a) (1976).

1. Except where otherwise indicated, the facts discussed in this opinion are based on the decision of the Federal Employees Appeals Authority (FEAA) Hearing Examiner's Decision which appears in the Joint Appendix (JA) at 49–65.

Although the Appeals Review Board (ARB) rejected the FEAA's recommendation that appellant be reinstated, neither it nor the District Court disagreed with any of its factual findings. The rest of the facts alluded to were culled from the four-volume Administrative Record (AR) filed in this court.

gist,[2] was in the continuous employ of the Department of Interior, National Park Service. Prior to 1956 he served for three summers with the Park Service on a seasonal basis. In the course of his 17 years appellant served in three parks—Carlsbad Caverns, Yellowstone National Park, and Glacier National Park—and moved his duty station 21 times. These moves were not made at appellant's request or for his convenience. Appellant's record with the Park Service was unblemished: there was not a single instance of a disciplinary action, and his performance ratings ranged from satisfactory to excellent.

In May 1965 appellant began serving in Glacier National Park as a park ranger, GS–9.[3] Shortly thereafter the Park Service determined that it needed to create positions for carrying out environmental programs within the natural areas. Accordingly, it promulgated a policy of offering long-term training to qualified employees for these new positions.[4] The training entailed attending a university for one year, at Government expense, to obtain a Master of Science degree in Ecology. Appellant applied and was accepted for a slot in this program.[5] An official of the Park Service orally assured appellant that when the training was completed appellant would serve in a wilderness setting as a resource management specialist. Appellant was also assured by this official that the assignment would be on a long-term basis so that he could use the expertise gained in the course of the training program.

In fulfillment of the training program appellant, at Government expense, attended Colorado State University from September 1967 until September 1968, earning a Master of Science degree in Ecology. At the conclusion of the program in September 1968 appellant was assigned to Glacier National Park as a resource management specialist, GS–11.[6]

In July 1969 William Briggle became the superintendent of Glacier National Park. There is evidence in the record indicating that Briggle's conduct in managing Glacier was erratic. At his request an unusual number of employees were transferred out of Glacier. Concerning the relationship between Briggle and appellant, there was a philosophical difference between the two: Briggle was concerned with overall management of the Park whereas appellant was concerned with preservation of resources. But preservation was appellant's job and he did it well.

On September 19, 1971 Briggle informed appellant that he was abolishing the position of resource management specialist, redistributing appellant's duties, and reassigning him. Briggle told appellant that this action had nothing to do with appellant's job performance and was taken only because the performance of the persons serving as resource management specialist was "difficult to evaluate."[7] When appellant asked Briggle what he meant by "difficult to evaluate," Briggle failed to respond.[8] Appellant's supervisors and other management officials testified that appellant's job performance was good,[9] that they had no trouble evaluating his work,[10] and that they had never recommended that the resource management specialist position be abolished.[11] In fact, they testified that there was a continuing need for the resource management specialist position at Glacier and there was no other Glacier employee

2. Appellant holds a Bachelor of Science degree in Forestry and a Master of Science degree in Ecology. The Ecology degree was earned in 1967–68 at the expense of and while on leave from the Park Service.

3. AR I at 160.

4. AR II at 153–155, 192; AR IV at 79–81.

5. AR II at 187–191; AR III at 543–549.

6. AR I at 160.

7. AR II at 205–207, 212–213; AR III at 421, 460; AR IV at 111, 136–137.

8. Id.

9. AR III at 414, 419, 451.

10. AR III at 429.

11. AR III at 421.

capable of providing the equivalent service.[12] Evidence in the record further indicates that because of Briggle's abolishment of the position ongoing studies and programs undertaken by appellant were aborted.[13] Briggle claimed that this work was farmed out to other employees.[14] But according to the overwhelming weight of the evidence in the record such was not the case; contrariwise, from the time appellant's position was abolished until the resource management position was reestablished in February 1975, the work of the resource management specialist was not performed.[15] Further, management studies issued after Briggle abolished appellant's position of resource management specialist indicated a need for that position.[16]

At the September 19 meeting Briggle offered appellant two options: a transfer out of Glacier or a reassignment within Glacier to the position of park ranger, GS–11.[17] Appellant accepted the park ranger position.[18] However, upon performing the duties of the park ranger position appellant discovered that it was the same position he occupied prior to the graduate training. It did not embrace any of the functions for which he was specially trained.[19] He therefore sent a memorandum dated November 5, 1971 to Briggle requesting consideration for a wilderness ranger position and indicating a willingness to take a cut to GS–9 to get back into resource and wilderness management. The request was denied.

While appellant was unsuccessfully attempting to transfer from one position to another within Glacier, Briggle was attempting to transfer appellant out of Glacier altogether. On October 29, 1971 Briggle telephoned the Midwest Regional Office and made a "special placement request" for appellant. A "special placement request" is a request for placement outside the park area to which the employee is assigned. As a result of Briggle's request, the Director of the Midwest Regional Office, J. Leonard Volz, sent a memorandum dated November 2, 1971 to the National Park Service requesting that appellant be given special placement consideration.

It was not until February 25, 1972 that appellant was advised of these special requests. He had never requested a transfer out of Glacier. In fact, in January 1971 he executed a Form 10–183, entitled "Career Plans and Skills Summary," [20] in which he expressed his desire to remain in the resource management position in the Rocky Mountain area; in February 1972 he executed another Form 10–183 in which he stated that he was uninterested in a transfer to another area. On an endorsement to this second form his immediate supervisor stated that it was in the Park Service's interest to retain appellant in his position for at least a year. However, Briggle, in his endorsement, stated that appellant lacked perspective and "[i]f he is ever to gain perspective and thus be of value to the

12. AR II at 203, 312, 320–323.

13. AR II at 208–209, 322–323; AR IV at 113–116, 139.

14. AR II at 94.

15. AR II at 204, 312, 320–323.

16  JA at 73–77.

17. AR II at 207–208, 214; AR IV at 111–112.

18. AR II at 215.

19. AR II at 214, 313; AR IV at 112.

20. The Career Development Plan of the National Park Service provides for reassignment from a register of employees who have signified an interest in assignment to particular jobs or locations. There are, however, specific exceptions to that general scheme:

> Although selections for promotion must be made from among the best qualified employees for the position, reassignments (without change in grade) may be made for other reasons, such as to permit employees to broaden their experience for career development purposes; to assist employees in solving health, family welfare and similar situations, or to solve placement cases resulting from reorganizations, modified workload situations or the like. * * *

AR III at 643.

Service, reassignment at this time is certainly in order." [21]

Appellant received and declined an offer of reassignment to Big Horn Canyon. By a memorandum dated March 7, 1972 Regional Director Volz accepted appellant's declination for the stated reason that a subsequent need for his talents and educational background arose in the Midwest Regional Office, Omaha, Nebraska, in connection with coordination and preparation of environmental impact statements. Interestingly, despite the alleged need in Omaha,[22] that position has never been filled.[23]

By a memorandum dated March 15, 1972 appellant asked Volz to reconsider the reassignment; he listed personal and medical problems which he stated would preclude his moving for the next six to twelve months. Volz's response was to make appellant's reassignment effective April 2, 1972 and allow him to remain in Glacier until June. Volz ignored appellant's alleged medical problems.[24]

In April 1972 appellant filed a grievance over the transfer order.[25] A hearing was conducted on August 14–15, 1972 before a Department of Interior ALJ. The ALJ recommended that the reassignment be affirmed.[26] He also recommended that the Park Service conduct an inquiry into Briggle's management practices and procedures.[27] On May 21, 1973 the Office of the Secretary of Interior issued a decision adopting the ALJ's recommendation.[28]

On May 24, 1973 Volz ordered appellant to report to duty on June 11, 1973.[29] By a memorandum dated June 6, 1973 appellant indicated that he would not report to Omaha. He also expressed his willingness to

---

**21.** JA at 56.

**22.** AR I at 275.

**23.** AR II at 262; AR III at 404–405, 408–409.

**24.** The FEAA hearing examiner concluded:

There is no evidence in the record that shows that Mr. Volz sought further explanation of Mr. McClelland's hay fever allergies from Mr. McClelland or Mr. McClelland's doctors who had provided documentation or from other medical personnel. Mr. Volz admitted that he was not a Doctor of Medicine and he further stated that he did not know how to evaluate the medical situation of Mr. McClelland. Mr. Volz, however, did state that he was not unacquainted with the effects of allergies because his daughter suffered from such problems and as a result had to remain housebound much of the time during the summer months. (Grievance Hearing Transcript, p. 313) Knowing this, Mr. Volz did not even inquire into whether Mr. McClelland's condition was similar to that of his daughter or whether Mr. McClelland, from a medical standpoint, could function satisfactorily in Omaha. There is no evidence that he considered the matter of Mrs. McClelland's health problems any differently. The agency contends that Mr. McClelland fabricated the health problems but there is no evidence to support this contention. It is concluded on balance, that Mr. Volz had his mind made up and did not wish to re-examine his decision.
JA at 63-64.

**25.** From April 1972 to June 1972, according to his testimony before the FEAA, appellant met with high officials of the Park Service to review his reassignment. They told appellant that it was their opinion that the transfer order was improper and that they would recommend to the Director that it be rescinded. But the order was not rescinded. Briggle and Volz overcame that recommendation. AR II at 252–261.

**26.** It is my recommendation that the order of reassignment of the said employee to the Midwest Region, National Park Service, be affirmed; provided, however, that reexamination of his qualifications, training, personal wants and the health of he [*sic*] and his family be made with a view to retransfer in keeping therewith at the earliest possible date consistent with the needs of the National Park Service and good management practices.
AR I at 243.

**27.** The ALJ recommended that:
* * * Departmental or Service inquiry be made into management practices and procedures covering the tenure of Superintendent William J. Briggle at Glacier National Park, Montana. To leave this matter unanswered as a cloud on his administration, particularly in view of the publicity it has received, is unfair to him, to the personnel of the Park and to the exceptional reputation of the National Park Service.
*Id.*

**28.** AR I at 225–228.

**29.** AR I at 223.

accept a demotion to a GS–7 if he could remain at Glacier.[30] Upon appellant's refusal to report to Omaha, the Regional Director issued his Decision to Remove.[31] Shortly after appellant's removal the resource management specialist position at Glacier was reestablished.[32]

On August 23, 1973 appellant appealed his removal to the Civil Service Commission. A hearing was held before the Federal Employees Appeals Authority (FEAA). It made the following factual findings: (1) there was available work in Glacier to which appellant could have been assigned; (2) the Park Service failed to explore other possible ways of filling the vacancy in Omaha and, despite the presence within Volz's jurisdiction of other specially trained resource management personnel, he did not inquire as to their availability; [33] (3) appellant was qualified for the vacancy in Omaha; (4) Volz had a history of responding favorably to Briggle's outplacement requests; [34] (5) the vacancy in Omaha was merely a pretext Briggle used to enable him to rid himself of appellant; [35] and (6) Volz failed to seek further explanation of appellant's health problems.[36]

The Department of Interior appealed to the ARB which reversed the FEAA and upheld appellant's removal. The ARB concluded that the Park Service had a rational basis for reassigning appellant to Omaha.[37]

Pursuant to the ALJ's recommendation,[38] the Department of Interior undertook a study of Briggle's management and personnel practices and procedures. This study was conducted from February 6 to 9, 1973 by Charles Mangers and Joseph Rumberg. The report recommended that Briggle be retained but that he be counselled about his management practices.[39] On February 13, 1973 the Mangers-Rumberg report was submitted to the Director of the National Park Service. At his FEAA hearing appellant requested a copy of the report. However, the hearing examiner held that he had no power to subpoena it and, further, that it need not be produced because it had not been relied upon in the adverse action against appellant.[40] Appellant also asked the ARB [41] and the Department of Interior [42] to release the report, but they too refused.[43] In support of its refusal the Department of Interior relied on various exemptions to the Freedom of Information Act (FOIA), 5 U.S.C. § 552(b)(2), (5), and (6)

---

**30.** AR I at 214.

**31.** AR I at 172–173.

**32.** AR II at 219–221; AR III at 428–429; JA at 73–77.

**33.** The FEAA concluded that:
> Mr. Volz firmly planted himself in support of Mr. Briggle's request for the outplacement of appellant and would consider no one else for the position.
> JA at 61.

**34.** The FEAA stated:
> Mr. Volz had responded favorably on at least five other occasions to Mr. Briggle's request for outplacement. * * * Mr. Volz did not deny any such request. Six outplacements of personnel, some in key staff and line positions, were not questioned. Out of a total of permanent staff of 55 employees this appears to be a high ratio of employees to be moved at the request of Mr. Briggle. This should have alerted Mr. Volz to inquire as to whether this supposedly non-disciplinary method of getting an employee out of Glacier was being abused. But apparently, Mr. Volz was concerned only with helping Mr. Briggle. * *
> JA at 62–63.

**35.** The FEAA stated:
> Although the evidence is circumstantial and indirect, the conclusion is drawn that Mr. Briggle wanted to rid himself of a gadfly. He chose a tool which would effect this desired end because he was unable to find another ground that could support an adverse action against Mr. McClelland.
> JA at 63.

**36.** See note 24 supra.

**37.** The ARB decision is reprinted at JA 67–70.

**38.** See note 27 supra.

**39.** See note 57 and accompanying text infra.

**40.** AR II at 333–346.

**41.** AR I at 79.

**42.** JA at 82–85.

**43.** AR I at 40, 44–45.

(1976);[44] on appeal the Solicitor upheld Interior's refusal to produce.[45] Appellant then renewed his request to the ARB to order production, but it declined, stating that "the material in question is not a part of the record presently before the Board for its review." [46]

On November 25, 1975 appellant filed a two-count complaint in the District Court. The first count sought judicial review pursuant to the Administrative Procedure Act, 5 U.S.C. § 702 (1976), of the Park Service's action in discharging him; it also sought back pay pursuant to the Back Pay Act, 5 U.S.C. § 5596 (1976), and reinstatement to a position in Glacier of either resource management. specialist or park ranger. The second count sought production of the Mangers-Rumberg report pursuant to the FOIA, 5 U.S.C. § 552(a) (1976). By a Memorandum and Order of May 12, 1976 the District Court (Pratt, J.) granted, on both counts, the Government's motion for summary judgment. The District Court held that the discharge was supported by substantial evidence in the administrative record and that the Mangers-Rumberg report was protected from disclosure as a personnel file under Exemption 6 of the FOIA, 5 U.S.C. § 552(b)(6) (1976). Appellant appeals from that decision.

## II

■ Throughout the protracted proceedings in this case appellant has unsuccessfully sought production of the Mangers-Rumberg report. Both the Department of Interior and the District Court shielded the report from disclosure on the ground that it came within the purview of various exemptions to the FOIA. We find this reliance on the FOIA to be misplaced. Appellant requested the report not as a member of the public entitled to it under the FOIA, but as a private individual in the throes of agency proceedings adjudicating his claim of arbitrary removal. Accordingly, in analyzing this case we employ traditional discovery doctrines as applied to agency proceedings.[47] We intimate no view on whether the Interior Department would be required to disclose the report to a member of the public seeking it under the FOIA.[48]

■ The extent of discovery that a party engaged in an administrative hearing is entitled to is primarily determined by the particular agency: both the Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure are inapplicable[49] and the Administrative Procedure Act fails to provide expressly for discovery; further, courts have consistently held that agencies need not observe all the rules and formalities applicable to courtroom proceedings. *See, e. g., Dixon v. Love*, 431 U.S. 105, 115, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977).

■ Some agencies have of their own accord adopted regulations providing for some form of discovery in their proceedings.[50] In addition to being bound by those

**44.** *Id.*

**45.** AR I at 52–53.

**46.** AR I at 40.

**47.** In *Ass'n for Women in Science v. Califano*, 185 U.S.App.D.C. 19, 22, 566 F.2d 339, 342 (1977), this court stated, "The FOIA neither expands nor contracts existing privileges, nor does it create any new privileges."

**48.** Although discovery law, not FOIA law, is used to analyze this case, for reasons discussed in note 54 *infra* the analysis contained in cases construing Exemption 5 to FOIA is relevant to our discussion.

**49.** In *Title Guarantee Co. v. NLRB*, 534 F.2d 484, 487 (2d Cir. 1976), the court stated: "Neither the liberal provisions of the Federal Rules of Civil Procedure pertaining to pretrial discovery nor the liberalized rules of the Federal Rules of Criminal Procedure have any bearing on [National Labor Relations] Board discovery procedures."

**50.** For example, the Federal Trade Commission provides discovery rights pursuant to regulations similar to the discovery rules of the Federal Rules of Civil Procedure. *See* 16 C.F.R. §§ 3.31–3.37 (1978). Other agencies, such as the National Labor Relations Board, severely restrict access to discovery. The NLRB reserves the matter to its own discretion and decides the issue on a case-by-case basis. *See* 29 C.F.R. §§ 102.117, 102.30(a) (1978). The courts will uphold the NLRB's action unless there is an abuse of discretion. *See, e. g., NLRB v. Valley Mold Co.*, 530 F.2d 693 (6th Cir.), *cert. denied*, 429 U.S. 824, 97 S.Ct. 77, 50

rules, the agency is bound to ensure that its procedures meet due process requirements. *Withrow v. Larkin*, 421 U.S. 35, 46, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). Therefore, discovery must be granted if in the particular situation a refusal to do so would so prejudice a party as to deny him due process. *NLRB v. Valley Mold Co.*, 530 F.2d 693 (6th Cir.), *cert. denied*, 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976); *J. H. Rutter Rex Manufacturing Co. v. NLRB*, 473 F.2d 223 (5th Cir.), *cert. denied*, 414 U.S. 822, 94 S.Ct. 120, 38 L.Ed.2d 55 (1973); *Electronic Design & Development Co. v. NLRB*, 409 F.2d 631 (9th Cir. 1969).

■ The Mangers-Rumberg report is uniquely relevant to appellant's case. The report deals with Superintendent Briggle's personnel management practices.[51] These practices may shed light on the validity of appellant's claim and the findings of the FEAA that the transfer order to Omaha was not for the good of the Service, but a mere pretext to enable Briggle to get rid of him. The manner in which Briggle dealt with other employees would be probative on the manner in which he dealt with appellant. The report might identify individuals that appellant may wish to call as witnesses in future Commission proceedings; it may lead appellant to additional evidence supportive of his claim.

Any remaining doubts as to the report's relevancy and its potential for substantiating appellant's claims are foreclosed by its germination from the very administrative proceeding—the hearing before the Department of Interior ALJ—in which the propriety of the transfer order was first adjudicated. The ALJ recommended the investigation which resulted in the Mangers-Rumberg report.[52] It is reasonable to infer that he was prompted to do so by evidence supportive of appellant's claim. Depending on what the report shows, to deny appellant access to the results of that investigation could do violence to our conception of fair procedure and due process.

Having concluded that the report is potentially relevant to appellant's case, we must now determine whether it is shielded from discovery by any privilege. The United States may claim either any of the privileges available to private litigants or any of the privileges exclusively available to it. The only privilege arguably applicable to the facts of this case is that of Executive privilege.[53]

■ The Executive privilege doctrine consists of two categories. The first category includes matters relating to state secrets or national security. *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). The second category, and the one relevant to this case, includes matters relating to other forms of official information, disclosure of which would be "injurious to the consultative functions of government * * *." *Kaiser Aluminum & Chemical Corp. v. United States*, 157 F.Supp. 939, 946, 141 Ct.Cl. 38 (1958), *quoted in NLRB v. Sears, Roebuck & Co.*, 421

L.Ed.2d 86 (1976); *NLRB v. C. H. Sprague & Son Co.*, 428 F.2d 938 (1st Cir. 1970).

**51.** *See* note 57 and accompanying text *infra*.

**52.** *See* note 27 *supra*.

**53.** In *Ass'n for Women in Science v. Califano*, *supra* note 47, 185 U.S.App.D.C. at 23, 566 F.2d at 343, Judge Tamm summarized the other privileges that are exclusively available to the Government:

There are three other privileges which have been claimed exclusively by the government. These privileges are based primarily on specific governmental interests, rather than on constitutional principles. The first is the informer's privilege, * * * which protects from disclosure the identity of persons who furnish information to law enforcement offi-

cials. The governmental interest in this instance is the protection of the flow of information concerning possible violations of the law. The second privilege is the law enforcement evidentiary privilege, * * * which is based primarily on the harm to law enforcement efforts which might arise from public disclosure of government investigatory files. The third privilege * * * has been called both the required reports privilege, and the official information privilege. This privilege * * * is directly analogous to the informer's privilege, for it is based on the governmental interest in protecting the flow of information concerning the subject of the report in question. * * *

(Citations and footnotes omitted.)

U.S. 132, 149, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975).[54] It shields from disclosure those documents "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 40 F.R.D. 318, 324 (D. D.C. 1966), *aff'd,* 128 U.S.App.D.C. 10, 384 F.2d 979, *cert. denied,* 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967), *quoted in NLRB v.*

*Sears, Roebuck & Co., supra,* 421 U.S. at 150, 95 S.Ct. 1504. The purpose of this privilege is to foster freedom of expression among governmental employees involved in decisionmaking and policy formulation.[55] Accordingly, factual material falls outside the scope of this privilege; to be protected the material must comprise part of the "deliberative process." *Vaughn v. Rosen,* 173 U.S.App.D.C. 187, 195, 523 F.2d 1136, 1144 (1975). Thus in *Boeing Airplane Co. v.*

**54.** *See also EPA v. Mink,* 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973); *Ass'n for Women in Science v. Califano, supra* note 47; *Black v. Sheraton Corp. of America,* 184 U.S.App.D.C. 46, 564 F.2d 531 (1977); *Vaughn v. Rosen,* 173 U.S.App.D.C. 187, 523 F.2d 1136 (1975); *Committee for Nuclear Responsibility, Inc. v. Seaborg,* 149 U.S.App.D.C. 385, 463 F.2d 788, *cert. denied,* 404 U.S. 917, 92 S.Ct. 242, 30 L.Ed.2d 191 (1971); *Freeman v. Seligson,* 132 U.S.App. D.C. 56, 405 F.2d 1326 (1968); *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 40 F.R.D. 318 (D. D.C. 1966), *aff'd,* 128 U.S.App.D.C. 10, 384 F.2d 979, *cert. denied,* 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967); *Machin v. Zuckert,* 114 U.S.App.D.C. 335, 316 F.2d 336, *cert. denied,* 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 124 (1963); *Boeing Airplane Co. v. Coggeshall,* 108 U.S.App.D.C. 106, 280 F.2d 654 (1960). The *Sears, Mink,* and *Vaughn* cases construed Exemption 5 of FOIA which exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5) (1976). Although we decide this case on the basis of common law discovery, the analysis contained in Exemption 5 cases is applicable because Exemption 5 exempts only those documents normally privileged in the civil discovery context. *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 148–149, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); *EPA v. Mink, supra,* 410 U.S. at 85–86, 93 S.Ct. 827; *Vaughn v. Rosen, supra,* 173 U.S.App.D.C. at 53, 523 F.2d at 1143. Thus in effect Exemption 5 is co-extensive with the common law discovery privileges: Exemption 5 shields from a member of the public seeking a document under FOIA that which would be shielded from a litigant seeking discovery from an agency. There is, however, an additional factor to be considered in the discovery context that is not considered in the FOIA context. This factor makes discovery more compelling in this case than it would be if a member of the public sought access to the Mangers-Rumberg report under FOIA. When a party seeks discovery against the Government and the Government interposes a claim of privilege, it is appropriate for the court to consider the litigant's need for the material. But

when a member of the public seeks access to material under FOIA and the Government claims that the material comes within the purview of Exemption 5, disclosure is permitted of that which would "routinely be disclosed" in private litigation. H.R.Rep.No.1497, 89th Cong., 2d Sess. 10 (1966). Stated differently, the extent of the requester's need is not considered in the FOIA context.

Here, as discussed in text, appellant's potential need for the document is great, and we find that to be a compelling reason for ordering the document to be made part of the administrative record. If appellant were merely a member of the public requesting the information, his need would not be considered. Therefore, the result—ordering production—would not necessarily be the same. But we intimate no view on whether the Mangers-Rumberg report would fall within the purview of Exemption 5.

This case does not present a situation where the claim of Executive privilege has constitutional underpinnings like, *e. g., United States v. Nixon,* 418 U.S. 683, 705–706, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

**55.** This privilege, as do all evidentiary privileges, effects an adjustment between important but competing interests. There is, on the one hand, the public concern in revelations facilitating the just resolution of legal disputes, and, on the other, occasional but compelling public needs for confidentiality. In striking the balance in favor of nondisclosure of intra-governmental advisory and deliberative communications, the privilege subserves a preponderating policy of frank expression and discussion among those upon whom rests the responsibility for making the determinations that enable government to operate, and thus achieves an objective akin to those attained by other privileges more ancient and commonplace in character. Nowhere is the public interest more vitally involved than in the fidelity of the sovereign's decision- and policy-making resources.

*Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, supra* note 54, 40 F.R.D. at 324–325 (footnotes omitted).

*Coggeshall*, 108 U.S.App.D.C. 106, 280 F.2d 654 (1960), investigative and other factual reports in the files of the Renegotiation Board were subject to discovery, whereas reports consisting of policy recommendations were held to be privileged; in *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, supra,* documents consisting wholly of opinions and deliberations were held to be privileged; and in *Freeman v. Seligson*, 132 U.S.App.D.C. 56, 405 F.2d 1326 (1968), documents under study by the Justice Department with a view toward prosecution were held to be privileged.

■ We have not seen the Mangers-Rumberg report. But based on the purposes of the investigation resulting in the report it would appear to be, at least partially, discoverable. The purpose of the investigation was not to aid in formulating a policy or making a decision, but to review past acts, namely, the management practices and procedures of Superintendent Briggle.[56]

The affidavit of one of the report's preparers,[57] Charles L. Mangers, characterizes the material in the report:

**56.** *See* note 27 *supra.*

**57.** In its entirety the Mangers Affidavit states:
Charles L. Mangers, having been duly sworn, deposes and says:

1. I am the Deputy Associate Director—Administration for the National Park Service. From March 5, 1972 to September 30, 1973, I was the Assistant Director—Management Services for the National Park Service. The facts set forth in this affidavit have come to my knowledge in my official capacity.

2. In his recommended decision on the employee grievance of B. Riley McClelland, Administrative Law Judge Robert Snashall recommended that "inquiry be made into the management practices and procedures covering the tenure of Superintendent William J. Briggle at Glacier National Park, Montana." On January 30, 1973, then-Director of the National Park Service Ronald Walter approved this recommendation. Joseph Rumberg, then-Deputy Associate Director—Operations, National Park Service, and I were appointed to conduct the inquiry.

3. During the period February 6 through February 9, 1973, Mr. Rumberg and I conducted an inquiry at Glacier National Park. We interviewed thirty-nine of the employees at the Park. A number of these were selected by Mr. Rumberg and myself to represent a cross-section of disciplines, grade levels and positions, others came forward voluntarily to be interviewed. Three former employees of the Park were also interviewed as part of the inquiry.

4. On our return to Washington, D. C., Mr. Rumberg and I composed a report setting forth our findings and recommendations. The report, dated February 13, 1973, was submitted to the Director of the National Park Service.

5. After receipt of our report, Director Walker considered what modifications, if any, should be made in management at Glacier National Park. Director Walker concluded that Mr. Briggle should be retained as Superintendent of the Park. He also concluded that Mr. Briggle should be counselled concerning his management practices and that a follow-up evaluation of management at the Park should be conducted in sixty (60) days.

6. The report prepared by Mr. Rumberg and myself consists of five typewritten, single spaced pages. Pages 1 through 3 and the first paragraph on page 4 are a narrative discussion and evaluation of management practices at Glacier National Park, focusing on the personnel management practices of Superintendent Briggle. The remainder of page 4 and the first paragraph of page 5 consist of the recommendation to Director Walker made by Mr. Rumberg and myself. The remainder of page 5 states our final analysis of the strong and weak points of Superintendent Briggle's management style.

7. The report, as a whole, deals solely with the internal management practices at Glacier National Park and, in particular, with the management practices of the Superintendent. The management practices discussed are the day-to-day management decisions and style of the Superintendent. The report does not deal with more general matters of compliance with general government-wide personnel policies.

8. Pages 1 and 2 and the first paragraph on page 3 are factual in character. The remainder of page 3 and the first paragraph of page 4 are the subjective evaluation made by Mr. Rumberg and myself of Superintendent Briggle's personnel management plan for Glacier National Park. Similarly, page 5 (after the first paragraph) is a subjective evaluation of Mr. Briggle's personal characteristics as a manager. These evaluations were prepared to aid the Director of the Park Service in his decision-making process. As both an employee and manager, I would be inhibited in making such evaluations in the future were I to know that they were required to be made public.

9. The recommendations section of the report on pages 4 and 5 was also prepared to

Pages 1 and 2 and the first paragraph on page 3 are factual in character. The remainder of page 3 and the first paragraph of page 4 are the subjective evaluation made by Mr. Rumberg and myself of Superintendent Briggle's personal characteristics as a manager. These evaluations were prepared to aid the Director of the Park Service in his decision-making process. As both an employee and manager, I would be inhibited in making such evaluations in the future were I to know that they were required to be made public.

Under the facts-deliberations dichotomy discussed above, pages 1 and 2 appear to be non-privileged since they contain factual material only. The material on pages 3, 4, and 5, dealing with an evaluation of Briggle's personnel management plan, appears to be non-privileged under the teachings of *Vaughn v. Rosen* ; in that case this court held that reports containing analyses of how agencies' personnel policies were being carried out fell outside the scope of Exemption 5 to the FOIA and hence had to be produced. Mangers' bald assertion that the "evaluations were prepared to aid the Director of the Park Service in his decision-making process" is insufficient to demonstrate that they were, in fact, part of the deliberative process. Judge Wilkey's opinion in *Vaughn v. Rosen* is strikingly apropos:

> [I]t is not enough to assert, in the context of Exemption 5, that a document is used by a decision-maker in the determination of policy. Unevaluated factual reports or summaries of past administrative determinations are frequently used by deci-

sion-makers in coming to a determination, and yet it is beyond dispute that such documents would not be exempt from disclosure. Rather, to come within the privilege and thus within Exemption 5, the document must be a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters. Put another way, pre-decisional materials are not exempt merely because they are pre-decisional; they must also be a part of the agency give-and-take—of the deliberative process—by which the decision itself is made.

\* \* \* \* \* \*

Looking at the evaluative portions of the sample reports themselves, we note nothing in them to suggest that they are anything other than "final objective analyses of agency performance under existing policy." While the Commission's evaluating team probably hopes that its analyses will have a salutary effect on agency personnel practices, the evaluative reports appear to be informational in nature. They provide the raw data upon which decisions can be made; they are not themselves a part of the decisional process.

173 U.S.App.D.C. at 194–196, 523 F.2d at 1143–1145 (footnote omitted).

Since we have not seen the Mangers-Rumberg report, our discussion of its potential relevance and of the applicability of Executive privilege to it is offered by way of guidance to the Commission.[58] It is for the Commission to examine the report, de-

---

aid Director Walker in his decision making. As author of the report, I understood at the time that it was prepared that it would receive only limited internal circulation. Accordingly, I felt that I could be candid in the advice being given the Director. Again, I would be inhibited in making such recommendations in the future were I to know that they were required to be made public.

10. The evaluation of Superintendent Briggle's personal strengths and weaknesses as a manager on page 5 is an evaluation of the Superintendent's personal characteristics. His personal characteristics as a mana-

· ger are also discussed and evaluated in the last paragraph on page 3 and the second paragraph on page 4. In my judgment, disclosure of these evaluative comments made privately by Mr. Rumberg and myself for the Director of the National Park Service would be a grave invasion of Mr. Briggle's privacy. JA at 122–126.

58. Our discussion of the report's relevance and the applicability of Executive privilege is based on the ALJ's stated purpose for recommending the investigation resulting in the report and on the Mangers Affidavit.

termine its relevance, rule on any claim of privilege, and balance appellant's need for it against the agency's need to protect the confidentiality of its deliberations. This procedure is analogous to the procedure we have frequently employed of requiring the District Court to conduct an *in camera* examination when a claim of Executive privilege is interposed to shield a document potentially relevant to a litigant's case. *See Black v. Sheraton Corp. of America,* 184 U.S.App.D.C. 46, 564 F.2d 531 (1975); *Committee for Nuclear Responsibility, Inc. v. Seaborg,* 149 U.S.App.D.C. 393, 463 F.2d 788, *cert. denied,* 404 U.S. 917, 92 S.Ct. 242, 30 L.Ed.2d 191 (1971); *Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena, supra; Boeing Airplane Co. v. Coggeshall, supra.* If after examining the document the District Court concludes that the litigant does have a need for it, the court must balance the extent of that need against the strength of the privilege claimed. *Committee for Nuclear Responsibility, Inc. v. Seaborg, supra,* 149 U.S. App.D.C. at 396, 463 F.2d at 791. Then the court is to excise those portions dealing with the deliberative process and disclose the remainder to the litigant. *Id.,* 149 U.S. App.D.C. at 399, 463 F.2d at 794; *Black v. Sheraton Corp. of America, supra,* 184 U.S. App.D.C. at 59, 564 F.2d at 544; *Boeing Airplane Co. v. Coggeshall, supra,* 108 U.S. App.D.C. at 114, 280 F.2d at 662.

We have already discussed the potential relevance of the Mangers-Rumberg report to appellant's case. This "showing of relevancy * * * is the 'preliminary showing of necessity' which permits at least an *in camera* review to determine the propriety of the claim." *Smith v. Schlesinger,* 168 U.S.App.D.C. 204, 220, 513 F.2d 462, 477 (1975) (footnote omitted), *quoting Committee for Nuclear Responsibility, Inc. v. Seaborg, supra,* 149 U.S.App.D.C. at 397, 463 F.2d at 792. Accordingly, we order the

Interior Department to turn the report over to the Commission. The Commission is to make the report part of the record in this case and then determine its relevance and appellant's need for it. The Government may interpose the claim of Executive privilege.[59] If, using the principles discussed in this opinion, the Commission determines that the privilege claim is meritorious, it shall balance appellant's need for the report against the agency's need to protect its deliberative process and then excise those portions where the balance tips in favor of protecting the deliberative process. After the appropriate excisions are made, the Commission shall permit appellant access to the report and then reopen the record to permit introduction of such further evidence as may be relevant.

### III

On remand the Commission should apply a different standard than it used earlier for determining the validity of appellant's grievance. In reversing the FEAA's decision the ARB framed the issue as being whether the reassignment was "supportable on any rational basis." [60] We find that to conflict with the statutory requirement that an adverse personnel action not be taken against a competitive civil service employee, as appellant was, except for "such cause as will promote the efficiency of the service." 5 U.S.C. § 7501(a) (1976). An action supportable on "any rational basis" is not necessarily one that will promote the efficiency of the service. *Motto v. General Services Administration of the United States,* 335 F.Supp. 694 (E.D. La. 1971), *aff'd,* 502 F.2d 1165 (5th Cir. 1974), *cert. denied,* 420 U.S. 927, 95 S.Ct. 1125, 43 L.Ed.2d 398 (1975), is illustrative of this principle. Motto's supervisor was dissatisfied with Motto's work performance and therefore decided to get

---

**59.** In fact, the Government may interpose any claim of privilege it deems appropriate. We focus on Executive privilege because it is the only privilege that the facts of this case suggest to us might be applicable.

To interpose an objection to disclosure based on Executive privilege "[t]here must be a formal claim of privilege, lodged by the head of

the department which has control over the matter, after actual personal consideration by that officer." *United States v. Reynolds,* 345 U.S. 1, 7–8, 73 S.Ct. 528, 532, 97 L.Ed. 727 (1953) (footnote omitted).

**60.** JA at 70.

rid of him. Fearing that a charge of inadequate performance would necessitate a hearing, and knowing that Motto would probably refuse a transfer, the supervisor ordered Motto transferred from New Orleans to Fort Worth "because of job requirements." 335 F.Supp. at 696. Although "job requirements" was a rational basis for transfer, the District Court held that the transfer was arbitrary and capricious.

> [I]f it is shown that a decision was made to rid the government of an employee without complying with the statute, the action may not be camouflaged as a discretionary decision to relocate the place where a function is performed. Transfer, like other government action affecting an employee's status, may not be based on "an arbitrary decision to achieve a predetermined result." * * *

*Id.* at 697.

In this case, as in *Motto*, the agency can support the adverse action on a rational basis: the need for appellant's services in Omaha. But that does not eliminate the possibility that the transfer was a sham—a way of achieving a predetermined result. On remand the Commission, to uphold the adverse action, must find a nexus between the action taken and the good of the service. *See Norton v. Macy*, 135 U.S.App. D.C. 214, 417 F.2d 1161 (1969). As Judge Tamm stated in *Doe v. Hampton*, 184 U.S. App.D.C. 373, 380, 566 F.2d 265, 272 (1977):

> In law as well as logic, there must be a clear and direct relationship demonstrated between the articulated grounds for an adverse personnel action and either the employee's ability to accomplish his or her duties satisfactorily or some other

legitimate governmental interest promoting the "efficiency of the service." Absent a nexus between the "cause" asserted * * * and "promotion of the efficiency of the service," the adverse action must be condemned as arbitrary and capricious for want of a discernible rational basis. * * *

(Footnotes omitted.) In *Doe* this court held that in the case of a federal employee's dismissal on the ground of mental disability it had to be shown that the mental disability adversely affected her work performance. Here the Commission must be able to conclude that appellant's transfer to Omaha would promote the efficiency of the service more than would his retention in Glacier.[61]

For the foregoing reasons the judgment of the District Court appealed from in this case is vacated, and this case is remanded to the District Court with instructions to remand it to the Civil Service Commission (1) to permit appellant access to the Mangers-Rumberg report with appropriate excisions, if necessary, and (2) to reopen the record to allow introduction of such further evidence as may be relevant to this case, after which the Commission shall reconsider the case on the augmented record in accordance with the principles stated herein and take such further action in the premises as may be appropriate.

*So ordered.*

ROBB, Circuit Judge, dissenting:

For several reasons I cannot join in the court's opinion.

---

**61.** Although we do not require the Commission, on remand, to adopt the findings and recommendation of the FEAA hearing officer, it does appear that the hearing officer was sensitive to the correct arbitrary and capricious test outlined in text; he considered what possible agency reasons for transfer would have promoted the good of the service:

> It is evident that the order of the reassignment and change of duty station and subsequent removal for failure to obey such an order could be upheld if Mr. McClelland had at first requested and then declined to move; or if there had been no work available for

> assignment to Mr. McClelland in Glacier National Park or even if there had been available work for him in the Park but the need for his services in Omaha was more critical to the National Park Service *and* the Service had reasonably explored other methods of filling the Omaha job *and* the Service reasonably considered such matters as Mr. McClelland's qualifications for the new assignment *and* his past mobility record *and* conditions under which his move was requested *and* the personal health problems which could affect his ability to perform satisfactorily in Omaha.

JA at 60 (emphasis in original).

I do not agree that the Appeals Review Board failed to apply the correct standard in determining the validity of McClelland's reassignment. The Board said:

*Accordingly, the sole issue for the Board's determination is whether the appellee's reassignment would serve the best interests of the service.* [Emphasis added] In other words, the Board must determine whether the reassignment now at issue was supported by substantial evidence and not arbitrary, capricious, or unreasonable. And, in the Board's view a reassignment is arbitrary and capricious *only* where it is not supportable on any rational basis. [Emphasis in original]

(J.A. 70)

In conclusion the Board said:

[T]he Board finds that the appellee's reassignment to the Midwest Regional Office, Omaha, Nebraska, was not arbitrary, capricious, or unreasonable, *but for such cause as would serve the best interests of the Service.* [Emphasis added]

(J.A. 72)

As I read this language the Board found that there was substantial evidence to support the conclusion that McClelland's reassignment served the best interests of the service. In the absence of such evidence, said the Board, the reassignment would be "arbitrary, capricious, or unreasonable." I think the Board's standard was correct.

Although the majority does not pass on the merits of McClelland's appeal the tone of the opinion strongly indicates a belief that his reassignment was unjust and invalid. I cannot join in this belief. There is substantial evidence of a number of valid reasons for McClelland's reassignment: a reduction in force in Glacier National Park and a reduced need for McClelland's services there, the need for his services to prepare environmental impact statements at Omaha, and personal and official hostility and disagreements between him and Superintendent Briggle. The National Park Service thought that for these reasons the reassignment was justified, in the best interests of the Service. We should not substitute our judgment for that of the Service;

it is not our business to run the National Park Service.

I cannot subscribe to the majority's treatment of McClelland's demand for the Mangers-Rumberg Report. I would remand the case to the District Court with directions to examine the Mangers-Rumbert Report *in camera*, to make available to McClelland those portions of the Report, if any, to which he is entitled under Rule 26 Fed.R. Civ.P., and to determine whether failure to make this material available to him deprived him of due process in the Civil Service proceedings.

McClelland's long and detailed complaint filed in the District Court is in two counts. Among other things the first count alleges that McClelland was deprived of due process by the refusal of the Civil Service Commission to make available to him the Mangers-Rumberg Report. The second count demands the production of this Report pursuant to the Freedom of Information Act. The case was presented to the district judge in the framework of the issues drawn by these allegations. This being so it was the duty of the district judge to determine whether as a litigant in the District Court on the first count McClelland was entitled to the production of the Report. Specifically, the question was whether the allegations of the first count justified production pursuant to Rule 26 Fed.R.Civ.P. and whether the allegations of the second count required production under the Freedom of Information Act.

Putting aside questions arising under the Freedom of Information Act, I think the allegations of the first count required the District Court to examine the Report *in camera*. Having done this the District Court could have identified the portions of the Report, if any, to which McClelland as a litigant under the first count, alleging a denial of due process, was entitled under the standards of Rule 26 Fed.R.Civ.P.; and those portions could have been made available to McClelland. The court could then have ruled advisedly on McClelland's allegation that refusal of the agency to produce the Report deprived him of due process.

Responding to McClelland's demand for the Mangers-Rumberg Report the Civil Service Appeals Examiner ruled that he had no subpoena power to compel production of the Report. (Tr. 344) In this he was correct. 5 C.F.R. § 772.307(c)(2).[1] As I read the majority opinion however it would graft on to the Civil Service Regulations the provisions of Rule 26 of the Federal Rules of Civil Procedure. This I think we have no right to do. Those rules govern the action in the District Court. They do not apply to proceedings before the Civil Service Commission and I cannot concur in the majority's attempt to mix them with the Civil Service Rules.

1. Under the Civil Service rules McClelland might have demanded the appearance of Mangers and Rumberg, the authors of the Report, as witnesses at the hearing; 5 C.F.R. § 772.-307(c)(2), but he did not do so.