746 F.2d 1383
 PACIFIC GAS AND ELECTRIC COMPANY, Southern California Edison
Company, San Diego Gas and Electric Company, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
California Public Utilities Commission, Sacramento Municipal
Utility District, Intervenors.
 No. 83-7854.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 2, 1984.
Decided Nov. 8, 1984.
 
 Glenn West, Howard V. Golub, PG & E, San Francisco, Cal., Charles Daly, S.D. Gas & Electric, Santa Rosa, Cal., Ann P. Cohn, Southern Pacific Edison Co., Rosemead, Cal., for petitioner.
 Joshua Z. Rokach, FERC, Washington, D.C., for respondent.
 G. Philip Nowak, Washington, D.C., for intervenor Cal. Public Utilities, et al.
 Petition for Review of Orders of the Federal Energy Regulatory Commission.
 Before GOODWIN, POOLE and BOOCHEVER, Circuit Judges.
 GOODWIN, Circuit Judge.
 
 
 1
 In this appeal from orders of the Federal Energy Regulatory Commission, petitioners challenge the Commission's authority to rule summarily on the interpretation of a contract for electricity transmission service. We affirm the FERC orders.
 
 
 2
 This dispute concerns a contract between the Sacramento Municipal Utility District (SMUD) and three California investor-owned utilities: Pacific Gas and Electric (PG & E), San Diego Gas and Electric (SDG & E), and Southern California Edison (SCE) (jointly referred to as the California Companies). SMUD and the California Companies entered into an agreement effective August 1, 1967, providing SMUD with electricity transmission service capacity over the Pacific Northwest-Southwest Intertie.[1] Under Article 9 of the agreement, the California Companies have agreed to provide SMUD with transmission service for transmitting energy to or from any Pacific Northwest utility. Three types of power-purchasing arrangements are contemplated by the agreement: (1) electricity purchased from northwest suppliers under long-term contracts (so-called northwest firm power), (2) electricity purchased on a spot basis from northwest utilities (so-called northwest dump power), and (3) electricity available from Canada under Canadian Entitlement Exchange Agreements (so-called Canadian Entitlement Power or CEP).
 
 
 3
 The agreement requires SMUD to make a request to the California Companies for purchasing electric power or reserving transmission capacity on the Pacific Intertie. Article 10 of the contract requires five years' advance notice for SMUD to change its reservation for firm power transmission capacity.
 
 
 4
 The contract further contains a so-called anti-yo-yo clause which provides that SMUD may not request an increase in firm power transmission service after any previously requested decrease in service. The effect of the anti-yo-yo clause is to prevent SMUD from continually readjusting its reservation of transmission capacity to reflect its actual use of northwest power. This restriction does not apply with respect to transmission capacity reserved for CEP, however.
 
 
 5
 This dispute centers on interpretation of Article 10(d) of the agreement, the anti-yo-yo clause, which provides in relevant part:
 
 
 6
 [SMUD] shall not, with respect to the amount of transmission service to be made available in any month under Article 9(a) and (b) [firm power], be entitled to any change which would become effective within twelve months following the last preceding change, nor shall [SMUD] be entitled to an increase in such amount after any previous decrease in such amount of service. The limitations contained in this paragraph shall not apply to changes required to accommodate changes in amounts of Canadian Entitlement Power [CEP] ... pursuant to the provisions of the Canadian Assignment Agreement.
 
 
 7
 In late 1967, SMUD requested that PG & E purchase CEP and reserve equivalent transmission service capacity on the Intertie. At times thereafter, in addition to importing CEP, SMUD used some of the CEP transmission capacity to import northwest dump power on a short-term basis. In 1970, SMUD was notified that its allotment of CEP would be completely withdrawn effective April 1975. Because of the withdrawal of CEP, SMUD notified PG & E in 1971 that it would no longer need any Intertie transmission capacity.
 
 
 8
 In 1973, SMUD gave PG & E a five-year notice that it wished to use the Intertie once again, this time for firm power to be purchased from the Bonneville Power Administration. PG & E refused to grant SMUD access to the Intertie on the ground that SMUD's 1971 request to decrease service capacity to zero had triggered the anti-yo-yo clause. SMUD insisted that, because it had requested the decrease in 1971 only in response to the elimination of its CEP allotment, the anti-yo-yo clause did not apply.
 
 
 9
 After requesting a series of postponements in the capacity requested for Bonneville power, SMUD requested that service begin in 1982. Also in 1982, SMUD requested an additional increase in capacity effective in 1987. PG & E rejected the request for both the 1982 service and the 1987 increase in service.
 
 
 10
 Throughout this dispute, the California Companies have contended that as soon as SMUD used its reserved transmission capacity for importing any electric power except CEP (e.g., northwest dump power), the anti-yo-yo clause was triggered, regardless of the purpose for which the capacity was originally reserved. SMUD has argued that the anti-yo-yo clause only governed the transmission capacity reservation; since it reserved capacity for the purpose of CEP, it is irrelevant that it used that capacity to import dump energy from time to time.
 
 
 11
 On July 30, 1982, SMUD filed a complaint against the California Companies with the FERC, pursuant to Section 306 of the Federal Power Act, 16 U.S.C. Sec. 825e, and Section 1.6 of the FERC Rules, 18 CFR Sec. 385.206. The complaint sought declaration of SMUD's rights under the agreement to transmission service over the Pacific Intertie. SMUD also filed a motion for summary disposition of the cause pursuant to FERC Rule 217, 18 CFR Sec. 385.217, which provides that the FERC may summarily dispose of a proceeding if there is no genuine issue of material fact in dispute.
 
 
 12
 The Commission, in its "Order Interpreting Contract, Granting Motion for Summary Disposition, and Granting Requests for Declaratory and Other Relief," 23 FERC p 61,042 (1983), found in favor of SMUD. The FERC held that the SMUD decrease in reserved service capacity was a change required exclusively to accommodate its loss of CEP, and, therefore, fell squarely within the Article 10(d) exception to the anti-yo-yo clause. Further holding that its decision turned on the plain, clear language of the contract, the FERC held that the allegations in this case did not warrant a trial-type hearing and that summary disposition was appropriate under Rule 217.
 
 
 13
 The Commission has interpreted Rule 217 to mean that summary disposition is appropriate if two conditions are met: (1) the proponent must have been afforded a reasonable opportunity to present arguments and factual support (written and oral) and that evidence must be viewed in its most favorable light, and (2) the Commission must find that a hearing is unnecessary and would not affect the ultimate disposition of an issue because there are no material facts in dispute or because the facts presented by the proponent have been accepted in reaching the decision. Coastal States Mktg. Inc. v. Texas-New Mexico Pipeline Co., 25 FERC p 61,164 (1983); see Citizens for Allegan County, Inc. v. FPC, 414 F.2d 1125, 1128-9 (D.C.Cir.1969).
 
 
 14
 In its review, this court must be satisfied that FERC properly addressed all the relevant factors in dispute and that a formal hearing was unnecessary for the Commission to reach its conclusion. Cerro Wire & Cable Co. v. FERC, 677 F.2d 124, 128-9 (D.C.Cir.1982). We must allow the FERC wide discretion in selecting its own procedures, Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978), and must defer to the FERC interpretation of its own rules, unless the interpretation is plainly erroneous. Phelps Dodge Corp. v. Fed. Mine Safety & Health Review Comm'n., 681 F.2d 1189, 1192 (9th Cir.1982). Whether or not to grant a full trial-type hearing is a matter within agency discretion. See Sierra Ass'n for Env't v. FERC, 744 F.2d 661, 663 (9th Cir.1984).
 
 
 15
 Although the limits of FERC Rule 217 are relatively untested in the courts, neither the Administrative Procedures Act nor FERC's own precedents require a hearing where there has been no showing that material facts are in dispute. Georgia-Pacific Corp. v. EPA, 671 F.2d 1235, 1241 (9th Cir.1982). See Sierra Ass'n for Env't., 744 F.2d at 663-4. As long as the agency has considered all the relevant factors and has rationally exercised its discretion in deciding matters of law in which it has special competence, we see no reason to disturb the Commission's conclusions. Cerro Wire & Cable, 677 F.2d at 128. See generally, K.C. Davis, 3 Administrative Law Treatise Sec. 14.7 (1980).
 
 
 16
 In its summary disposition order, the FERC held that there were no disputed issues of material fact, a conclusion which appellants challenge here. FERC concluded that, of the three issues of fact identified by the California Companies, two were properly characterized as questions of law which turned upon contract interpretation. The remaining question, whether SMUD could use excess transmission service reserved for CEP to transmit dump energy without triggering the anti-yo-yo clause, was resolved in favor of SMUD. FERC maintained that the interpretation of the contract offered by the California Companies contradicted the express unambiguous language of the contract.
 
 
 17
 We agree with the FERC conclusion. The Commission's interpretation of the contract was based upon the unequivocal language of Article 10, which makes no reference at all to the manner in which SMUD uses its transmission service reservation. Furthermore, Article 10(d) applies only to reservations for transmission service pursuant to Articles 9(a) and 9(b), the provisions concerning firm power transmission. It would be contrary to the plain language of Article 10(d) to conclude that CEP transmission service could not be used for transmitting dump energy without triggering that provision. Article 10(d) simply is inapplicable to fluctuations in CEP and dump energy service reservations.
 
 
 18
 In concluding that the anti-yo-yo clause did not preclude SMUD use of the Intertie, the FERC was not deciding in a vacuum. The FERC was presented with highly technical legal analyses by all of the concerned parties; all the parties were afforded a full opportunity to respond in writing, to supply exhibits and to present affidavits. See, e.g., Sierra Ass'n for Env't., 744 F.2d at 664. While these documents show a significant disagreement among the parties on the interpretation of the contract, the parties were in essential agreement on the history and factual bases for the dispute. None of the parties has contended, moreover, that the contract itself is ambiguous; only the legal significance of the language and the historical background is disputed.
 
 
 19
 In the absence of ambiguity, the FERC must ascertain the meaning of the contract from its language without resort to parol or extrinsic evidence. Papago Tribal Util. Auth. v. FERC, 723 F.2d 950, 955 (D.C.Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 3511, 82 L.Ed.2d 820 (1984). A contract is not ambiguous merely because the parties disagree on its interpretation. Id.; See Appalachian Power Co. v. FPC, 529 F.2d 342, 347-8 (D.C.Cir.), cert. denied, 429 U.S. 816, 97 S.Ct. 58, 50 L.Ed.2d 76 (1976). To ascertain the plain meaning of the contract, the FERC employed its unique expertise in rate-setting contracts and in the arrangements by which Intertie capacity has been and was intended to be allocated. The FERC properly considered the language of the agreement in light of the purpose for which the contract was concluded and the purpose for which distinctions were drawn among CEP, dump energy and firm power. The FERC conclusion that only one interpretation of the contract was possible was based upon the Commission's application of its expertise to the meaning of the agreement's language. Because the FERC interpretation was so clearly based upon the agency's expertise in electricity transmission regulation, its conclusion is entitled to respect and deference. See Cincinnati Gas & Elec. Co. v. FERC, 724 F.2d 550, 554 (6th Cir.1984), and cases cited therein. This court will not set aside an agency's action merely because, were we to try the matter anew, we might reach a different result. Because the agency conclusion was supported by substantial evidence, was neither arbitrary, capricious, nor an abuse of discretion, we must affirm its conclusion that, as a matter of law, this agreement was susceptible to only one interpretation. See Simeon Mgmt. Corp. v. FTC, 579 F.2d 1137, 1142 (9th Cir.1978).
 
 
 20
 The California Companies also have alleged that the FERC abused its discretion by not permitting the parties to engage in discovery prior to summary disposition of the SMUD complaint. The extent of discovery to which a party to an administrative proceeding is entitled is primarily determined by the particular agency; the Federal Rules of Civil Procedure are inapplicable and the Administrative Procedures Act fails to provide expressly for discovery. Furthermore, courts have consistently held that agencies need not observe all the rules and formalities applicable to courtroom proceedings. McClelland v. Andrus, 606 F.2d 1278, 1285 (D.C.Cir.1979). If an agency has adopted rules providing for discovery in its proceedings, the agency is bound by those rules and must ensure that its procedures meet due process requirements. Id. at 1285-6. The FERC properly refused to grant discovery because there were no material issues of fact in dispute for which discovery would be necessary.
 
 
 21
 Several other issues are raised by the California Companies in their briefs before this court. As a preliminary matter, the Companies challenge the FERC's choice of law. They have argued before this court that California law rather than general principles of contract law should have governed the FERC interpretation. We have examined in detail the effect of the choice of law and find that we need not reach this question because, under either choice of law, the FERC interpretation would be correct.
 
 
 22
 Finally, the California Companies maintain that they were prejudiced by SMUD's delay of nearly 10 years in filing suit for declaratory relief. The FERC considered the defense and concluded that it was the California Companies' failure to abide by the contract terms which permitted both the SMUD delay in filing this action and the postponement of service requested by SMUD.
 
 
 23
 The decision not to permit the defense of laches is properly left primarily to the discretion of the FERC and must depend upon the facts and circumstances of the particular case. Coalition for Canyon Preservation v. Bowers, 632 F.2d 774, 779 (9th Cir.1980). Furthermore, because the application of the doctrine of laches is discretionary, this court's standard of review is whether the FERC properly found either no lack of diligence by SMUD or no prejudice to the California Companies. Preservation Coalition, Inc. v. Pierce, 667 F.2d 851, 854 (9th Cir.1982). The FERC made both findings.
 
 
 24
 In conclusion, we hold that the FERC properly disposed of this proceeding through its summary disposition procedure. The FERC orders are affirmed.
 
 
 
 [1]
 The Pacific Northwest-Southwest Intertie consists of a series of high-voltage electricity transmission facilities connecting the Pacific Northwest states with California. Because of the seasonal availability of inexpensive surplus hydroelectric power in the northwest (and the dependence of California upon less desirable forms of energy), the federal government in the early 1960s established a plan which led to negotiations aimed at transmitting power from the northwest into the southwest. The contract establishing the Intertie provided for transmission not only of energy from the northwest, but also of surplus hydroelectric power from Canada which the Canadian government wished to sell to the United States on a short-term basis. Both the Department of the Interior and the Congress were involved in approving the Intertie plan and this particular service contract