FRIENDS OF THE COWLITZ and
CPR–Fish, Petitioners,

City of Tacoma, Intervenor,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

No. 99–70373.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 8, 2000

Filed June 14, 2001

Jonathan I. Feil, Simburg, Ketter, Sheppard & Purdy, LLP, Seattle, Washington, for the petitioners.

Douglas W. Smith, General Counsel, Jay L. Witkin, Solicitor, Timm L. Abendroth, Lona T. Perry, Federal Energy Regulatory Commission, Washington, D.C., for the respondent.

Before: B. FLETCHER and FISHER, Circuit Judges, and SCHWARZER, District Judge.[1]

BETTY B. FLETCHER, Circuit Judge:

This is an appeal from the summary dismissal by the Federal Energy Regulatory Commission ("Commission" or "FERC") of a complaint brought by two citizens groups dedicated to maintaining sustainable populations of anadromous and resident fish in the Cowlitz River Basin in southwestern Washington state. The petitioners, Friends of the Cowlitz River and CPR–Fish, allege that the City of Tacoma ("Tacoma") has failed to comply with the terms of its license to operate a hydroelectric project on the Cowlitz River. Although we are concerned that the grounds for the Commission's summary disposition rested on an improper legal basis and lacked support in the record, we deny the petition on the ground that the FERC has virtually unreviewable discretion to enforce (or, in this case, to not enforce) any alleged license violations.

I.

The Cowlitz River Project (FERC Project No. 2016) is a major hydroelectric project in Lewis County, Washington, consisting of two dams: the upstream Mayfield Dam (185 ft., completed in 1963), and the downstream Mossyrock Dam (325 ft., completed in 1968). Separated by thirteen miles, the two dams have a combined generating capacity of 460 megawatts. The project is owned and operated by Tacoma, under a license granted by the FERC in 1951 ("License").

The Cowlitz River, a lower tributary of the Columbia River, is home to native populations of anadromous fish, including chinook and coho salmon and steelhead trout. At the time of the licensing, opponents of the project, including the Washington Department of Fisheries (since renamed the Washington Department of Fisheries and Wildlife, or "WDFW"), argued that the dams would destroy the use of the river above Mayfield Dam for spawning. In response to these concerns, Tacoma maintained that it could sustain fish populations by facilitating upstream and downstream fish passage through the construction of fish ladders and other facilities. In addition, it proposed creating extensive fish hatcheries as a complement to the fish protection measures.

Accordingly, the following two articles were eventually incorporated into the License. Article 37[2] states, in pertinent part:

> The Licensee shall, for the conservation, and development of fish and wildlife resources, construct, maintain and operate, or arrange for the construction, maintenance and operation of such facilities and comply with such reasonable modifications of the project structures and operation as may be ordered by the Commission upon its own motion or upon the recommendation of the Secretary of the Interior of fish and wildlife

---

[1]. The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

[2]. Article 37 was added to the license in 1964, and superseded the original Article 30.

agency or agencies of any State in which the project or a part thereof is located, after notice and opportunity for hearing and upon findings based on substantial evidence that such facilities and modifications are necessary and desirable, reasonably consistent with the primary purpose of the project, and consistent with the provisions of the [Federal Power Act].

In addition, Article 57[3] of the license states:

> Licensee shall continue to cooperate with the fishery agencies in the development of details of design, operation, and maintenance of these and of other facilities needed to maintain the existing runs of anadromous fish at the project and in evaluating the degree of success of these facilities to maintain those runs. Licensee shall submit to the Commission for approval functional drawings of permanent downstream migrant fish traps and design drawings of the fish-barrier dam as proposed for construction on the Cowlitz river adjacent to the salmon hatchery, and construction thereof shall not commence prior to Commission approval.

In 1967, Tacoma and WDFW entered into an agreement ("Agreement") whereby the parties stated their intention to "maintain the numbers" of adult salmon returns at defined levels, through two methods: by making use of the watershed above Mayfield Dam to spawn and rear salmon; and by supplementing these populations through hatchery production. Tacoma agreed to construct, operate, and maintain certain fish facilities, including an adult release site, a downstream migrant trapping facility in the Mossyrock reservoir,

downstream migrant bypass facilities at Mayfield Dam, a salmon hatchery (along with facilities for supplying sufficient water to the hatchery), a barrier dam, fish ladders, and adult separation facilities.

At the same time, the Agreement expressly recognized that it is "subject at all times to the terms and conditions of the said license irrespective of the effect of any other wording or expression of intent otherwise set forth herein." Tacoma submitted a preliminary draft in April 1967 to the Commission, requesting comments and asking whether the License required the agency to approve the Agreement. In its reply, the Commission advised Tacoma that its approval was not required, but suggested changes in several provisions and requested that a final copy of the Agreement be included in the agency's files.

In May 1997, Friends of the Cowlitz River and CPR–Fish filed a complaint with the FERC, alleging *inter alia* that Tacoma had violated the terms of the Agreement and the License by failing to maintain the agreed-upon levels of fish populations and by failing to cooperate with WDFW in instituting remedial measures. As relief for the alleged violations, these petitioner organizations requested that Tacoma be ordered to comply with WDFW's requests for additional hatchery facilities, that Tacoma be required to make up the deficit in adult fish under the Agreement or pay monetary compensation, and that Tacoma be assessed a civil penalty for each day that the alleged violations continued.

According to the petitioners' complaint, Tacoma has failed to meet the required adult return numbers for at least one of the three anadromous species every year

---

**3.** Article 57 was added in 1966, following the submission of six drawings developed by Tacoma in conjunction with WDFW depicting a game fish hatchery, a salmon hatchery, and a rearing pond. In amending the license to

include Article 57, the Commission recognized the need to require continued cooperation at the field level between Tacoma and the fishery agencies.

since the Agreement's inception. Furthermore, the required numbers were not met for all three species during the five years immediately preceding the filing of the complaint (i.e., from 1992 through 1996), when the numbers of returning fish dropped to "crisis proportions." The complaint alleged that Tacoma's overreliance on a single salmon hatchery and the associated rearing densities constituted "the primary reasons the mitigation levels in the 1967 Agreement cannot be met." Although WDFW had proposed additional salmon rearing facilities since 1988, Tacoma consistently withheld its consent to these proposals. Thus, according to the petitioners, Tacoma's refusal to cooperate has prevented the fish hatchery facilities from adequately mitigating for the fisheries resources damaged by the Cowlitz River Project. In addition, the petitioners claimed that Tacoma had neglected its obligation under the license to operate downstream juvenile passage facilities through the dams, and that other key facilities had been allowed to languish with little or no use. Finally, the petitioners charged that Tacoma had failed to install and operate permanent downstream fish traps, or even to submit designs for such traps to the Commission, in clear violation of Article 57.[4]

In the petitioners' view, the Agreement was intended by both parties to effectuate the terms of Articles 37 and 57, pursuant to which Tacoma was required to design and construct facilities to sustain anadromous fish populations and to continue to cooperate with WDFW in the development of such facilities. As stated in the complaint, "Tacoma's failure to provide sufficient rearing capacity to accomplish the adult fish returns required in the 1967 Agreement, and its failure to cooperate with Fish & Wildlife's proposals or to submit feasible alternatives, constitute violations of the 1967 Agreement and the [analogous] provision of Article 57...." Furthermore, Tacoma's "recalcitrance in accepting much needed improvements in hatchery operations has severely damaged the fisheries' resources of the Cowlitz River.... Besides the ecological harm, Tacoma's accumulated deficit in returning adult salmon has imposed substantial economic losses on Complainants and the people of Lewis County."

In November 1998, nearly eighteen months after the filing of the complaint, the Commission issued an order summarily dismissing the complaint without prejudice on the grounds that, among other things, the Agreement was a private contract whose terms were never approved by the Commission or incorporated into the License itself. The Commission held that since alleged violations of the Agreement did not amount to violations of the License, the complaint was meritless and did not require an evidentiary hearing or a formal investigation.

Significantly, the Commission did not base its ruling on its discretion to not enforce alleged license violations. Rather, the Commission affirmatively found that "Tacoma ha[d] complied with all of requirements of Articles 37 and 57 of the license, ha[d] submitted all of the plans and design drawings required by those articles, ha[d] constructed and operated all of the fishery facilities specifically prescribed in the license, and [wa]s releasing new fish consistent with the requirements of the license." Finally, the Commission concluded that there was "no basis for the ... allegation in the complaint that Tacoma violated Article 57 of the license by failing to install and operate permanent

---

**4.** The FERC contends that this claim has been waived because the petitioners failed to raise it on appeal. This contention is meritless, since the petitioners expressly raise this issue in their opening brief.

functional downstream fish traps or to submit designs for such fish traps.... Tacoma has been operating the downstream fish traps in compliance with ... Article 57 of the license; there is no violation of the license."

In summarily disposing of the complaint, the Commission also remarked that the relicensing proceeding was a preferable forum to resolve the issue of declining fish populations in the river. The Commission likewise dismissed the complainants' request for rehearing in January 1999, after they had submitted more evidence intended to show that the Agreement was in fact a part of the License.

According to the petitioners, there are presently no operating fish ladders at the dams, and the project currently blocks all upriver passage of anadromous fish upstream of the barrier dam. For its part, Tacoma maintains that the levels specified in the Agreement only represent "goals," that these levels were based on unrealistic assumptions and imperfect knowledge about fish cycles at the time of the Agreement, and that the recent sharp decline in numbers is not due to the city's failure to abide by the terms of the Agreement or the License, but is instead the result of factors beyond its control.[5] Indeed, Tacoma claims that it has expended considerable resources to comply with the Agreement and License, and that it has met with substantial success in mitigating damage to fish populations. Furthermore, Tacoma contends that in requiring the city to "cooperate" with WDFW, Article 57 does not obligate it to "acquiesce" in all of WDFW's requests, including the construction of additional salmon hatchery facilities. Finally, Tacoma argues (as the Commission reasoned in its summary disposition order) that because the terms of the Agreement were never formally incorporated into the License anyway, any failures to meet the terms of the Agreement therefore do not constitute equivalent violations of the License.

Significantly, Tacoma's license is due to expire in November 2001, and consultations have already begun to establish relicensing terms. 85 FERC at 62,236. Both petitioner organizations, as well as WDFW, are participants in the relicensing negotiations. In this regard, however, the petitioners claim that Tacoma is seeking to gain collateral advantage in the relicensing of the Project by delaying and rejecting requests for compliance with its existing License. Citing evidence from Tacoma's internal documents, the petitioners charge that Tacoma's strategy is consistently to reject demands for mitigation of existing violations, while committing to take a hard look at fisheries issues in the relicensing process.

In addition to other organizations and groups, WDFW, the U.S. Fish and Wildlife Service ("USFWS"), and the National Marine Fisheries Service ("NMFS") successfully moved to intervene before the Commission on the side of the petitioners.[6] Tacoma has intervened on the side of the FERC.

## II.

We have jurisdiction pursuant to § 313(b) of the Federal Power Act ("FPA") (codified at 16 U.S.C. § 825*l* (b) (2000)).[7] We also have jurisdiction pursuant to the judicial review provisions of the

---

5. In its summary disposition order, the Commission noted the existence of a provision in the Agreement that absolves Tacoma of responsibility for reductions in fish stocks due to causes "beyond the City's control."

6. For reasons that are not entirely clear, WDFW has apparently decided not to intervene in this appeal.

7. This provision states that "[a]ny party to a proceeding under this chapter aggrieved by

Administrative Procedures Act ("APA") (codified at 5 U.S.C. § 701 *et seq.* (1996)).[8]

The Commission's decision is subject to the standards of judicial review defined in APA § 706 (codified at 5 U.S.C. § 706 (1996)),[9] and FPA § 313(b). Under the APA, FERC actions may be set aside if and to the extent that they are: (1) arbitrary or capricious, in that the agency did not engage in reasoned decision-making, *see, e.g., Clifton Power Corp. v. FERC,* 88 F.3d 1258, 1265 (D.C.Cir.1996); or (2) not supported by substantial evidence, *see, e.g., Pacific Gas and Electric Co. v. FERC,* 746 F.2d 1383, 1387 (9th Cir.1984).

■ Notably, with respect to statutory interpretation, *Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), mandates that absent a clear expression of congressional intent to the contrary, courts should defer to reasonable agency interpretations of ambiguous statutory language. However, as we recently held in *American Rivers v. FERC,* 201 F.3d 1186 (9th Cir.1999), "[W]here ... the petitioners call into question the Commission's understanding of its statutory mandate, our review is de novo." *Id.* at 1194. Decisions of the Commission interpreting its own regulations are also entitled to "substantial deference ... unless its interpretation is plainly erroneous or inconsistent with the regulation." *Bluestone Energy Design, Inc. v. FERC,* 74 F.3d 1288, 1292

an order issued by the Commission in such proceeding may obtain a review of such order in the United States Court of Appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business ... by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition.... Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part." Given the petitioners' timely filing of its petition after the Commission's order denying rehearing, we therefore have proper jurisdiction over this appeal.

8. Section 702 reads, in pertinent part, as follows: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." The availability of such review is limited to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704 (1996). These provisions apply to agency actions "except to the extent that(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a) (1996).

9. APA § 706 states:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(D.C.Cir.1996) (internal quotations omitted). *But cf. Confederated Tribes and Bands of the Yakima Indian Nation v. FERC,* 746 F.2d 466 (9th Cir.1984) (holding that the Commission had violated its own regulations in issuing a hydropower license before the licensee had submitted a required report on the projected effect of the dam on fish and wildlife resources).

■ Most important for purposes of this case, the Supreme Court has held "that an agency's decision not to take enforcement action should be presumed immune from judicial review under [APA] § 701(a)(2)." *Heckler v. Chaney,* 470 U.S. 821, 832, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985); *see also Alaska Fish and Wildlife Federation and Outdoor Council, Inc. v. Dunkle,* 829 F.2d 933, 938 (9th Cir.1987). However, this presumption may be overcome "where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Chaney,* 470 U.S. at 833, 105 S.Ct. 1649; *Alaska Fish and Wildlife,* 829 F.2d at 938. Put another way, a decision not to enforce may be reviewable if Congress has provided clear legislative direction limiting an agency's enforcement discretion, and the agency nonetheless engages in a pattern of nonenforcement. *Chaney,* 470 U.S. at 832–33, 105 S.Ct. 1649.

### III.

The FPA constitutes a "complete scheme of national regulation" to "promote the comprehensive development of the water resources of the Nation." *First Iowa Hydro–Electric Co-op. v. Federal Power Com'n,* 328 U.S. 152, 180, 66 S.Ct. 906, 90 L.Ed. 1143 (1946). Under FPA § 4(e) (now codified at 16 U.S.C. § 799 (2000)), the Commission is empowered to grant licenses of up to fifty years for hydroelectric projects on the nation's waterways, after which time the Commission may choose to relicense a given project. 16 U.S.C. § 808(a)(1) (2000). In granting a license, however, the Commission is required to give due consideration to a project's effect on fish and wildlife. 16 U.S.C. § 803(a) (2000). The Commission is also required to include conditions in the license based on "fish and wildlife recommendations" made by the relevant national and state governmental agencies and affected Indian tribes, unless it determines that such recommendations are "inconsistent with the purposes and requirements" of the FPA. 16 U.S.C. §§ 803(a) and (j) (2000).

### 1. Did the Commission err in summarily dismissing the complaint?

At the heart of the petitioners' complaint lies the claim that Tacoma has violated the Agreement by failing to sustain the agreed-upon numbers of returning anadromous fish. For its part, the FERC, through its order dismissing the complaint, reasoned that the Agreement was never incorporated into the License, and that therefore "the facts alleged do not constitute a past or present violation of the license."

The FERC's central legal premise is therefore predicated on the contention that the 1967 Agreement only represented a private covenant between WDFW and Tacoma, and that its terms had never been formally incorporated into the License itself. In this regard, the Commission noted that even though it had commented on the Agreement and accepted a copy for its files, it had never accepted the Agreement as an amendment to the License. Although the petitioners presented evidence of contemporaneous internal communications suggesting that Tacoma itself viewed the Agreement as effectuating the terms of Articles 37 and 57, the Commission opined that even if it were true that Tacoma and WDFW had intended the Agree-

ment to be incorporated into the License terms, the Commission itself (as party to the License) had not acceded to the Agreement. Indeed, by its express language, the Agreement is "subject to" the terms of the License. Hence, any alleged violations of the terms of the Agreement—and especially the decline in anadromous fish populations—did not by themselves constitute violations of the License.

We find the Commission's conclusion with respect to the legal status of the Agreement to be reasonable, and perhaps even deserving of deference. Although the evidence in the record appears to indicate that the Commission vetted and gave its blessing to the Agreement, and that Tacoma itself may have envisaged the Agreement as specifying its obligations under the License, the parties themselves lacked the power (and the FERC never formally agreed) to incorporate its terms into the License. At most, the Agreement bears on the parties' interpretation of what the License requires. Thus, the Commission reasonably concluded that the Agreement was never incorporated into the License.

■ Such reasoning does not, however, mandate the further conclusion that no license violations may have occurred; indeed, we hold that the Commission interpreted Article 57 of the License unreasonably in light of the petitioners' allegations. For even if the Agreement was not formal-

ly incorporated into the license, it still constituted the only tangible manifestation of Article 57's requirement that Tacoma "cooperate" with WDFW. As the petitioners have trenchantly argued, "How else can one give meaning to the requirement that Tacoma 'cooperate' with WDFW, unless it is required to observe the agreement it reached with that agency?" The alleged violations of the Agreement, in the form of failed fish quotas and lapsed commitments on Tacoma's part to build and operate facilities, thus constitute a colorable claim of failed "cooperation" with WDFW even without the formal incorporation of the Agreement into the License. Hence, to summarily dispose of the petitioners' complaint was unjustified on that legal basis.

In addition, the petitioners' complaint contained more than the bare allegation that Tacoma had failed to meet the anadromous fish quotas enshrined in the Agreement. Other charges included Tacoma's alleged neglect in operating upstream adult and downstream juvenile passage facilities over both dams, in violation of Article 37,[10] as well as Tacoma's alleged failure to install and operate (or even submit for FERC approval) permanent downstream fish traps, in violation of Article 57.[11]

The Commission's sidestepping of these factual allegations raises doubts about the legal correctness of its order under the FERC's own summary disposition stan-

---

10. In particular, the petitioners argue that the Commission acted arbitrarily in dismissing without investigation its allegation of Tacoma's failure to operate the passage facilities, in violation of Article 37. According to the petitioners, the Commission overlooked the fact that only Mayfield Dam is currently equipped with a downstream passage facility.

11. As noted earlier, Article 57 requires that Tacoma "submit ... for approval functional drawings of permanent downstream migrant fish traps." Although the Commission al-

lowed Tacoma to discontinue the use of temporary fish traps at Mossyrock Dam in 1974, the petitioners assert that this did not relieve Tacoma of its obligation under Article 57 to eventually install and operate permanent fish traps. These traps have never been installed, and the Commission's finding that Tacoma had in fact received approval for and was operating such traps is, in the petitioners' view, "arbitrary and capricious, contrary to the facts before the Commission, and an unreasonable and irrational reading of the License."

dard. Summary dispositions are governed by FERC Rule 217, the terms of which are analogous to the familiar legal standard for summary judgment: *"General rule:* If the decisional authority determines that there is no genuine issue of fact material to the decision of a proceeding or part of a proceeding, the decisional authority may summarily dispose of all or part of the proceeding." 18 C.F.R. § 385.217(b) (2000).[12] Given that the allegations in the petitioners' complaint raise material issues of fact that would, if proven true, amount to license violations, we hold that the FERC plainly erred in summarily disposing of the complaint.

Put another way, the Commission's blanket conclusion that Tacoma had not violated the terms of the License and that the petitioners' specific charges with respect to fishtraps and downstream passage facilities were unfounded does not appear to be supported by "substantial evidence." *See* 16 U.S.C. § 825*l* (b) ("The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive."). In conjunction with the agency's refusal to conduct an investigation or an evidentiary hearing, discussed *infra*, the Commission did not appear to take into consideration "all of the relevant factors" in reaching its ultimate determination. Instead, the Commission's factual findings sound more like conclusory statements. Accordingly, we believe that the Commission's decision summarily to dispose of the petitioners' complaint was plainly erroneous as a matter of law.[13]

Finally, we find that the Commission's stated preference for addressing the problem of potential license violations and declining fish stocks through the relicensing process does not constitute a valid legal basis for disposing of the complaint. Under FPA § 31 (16 U.S.C.A. § 823b (West Supp.2000)), the Commission's enforcement powers and responsibilities are limited to violations of existing licenses; a decision by the Commission to defer consideration until relicensing, which operates only prospectively, has no basis in the terms of the statute.

Our prior cases also support this conclusion. In *Confederated Tribes,* 746 F.2d at 470, we held that the FERC could not "satisfy its obligations under the relevant statutes by deferring consideration and implementation of fishery protection measures until after licensing." The petitioners in that case contested the relicensing of Chelan County Public Utility No. 1 to operate the Rock Island hydroelectric project on the Columbia River, on the ground that fishery issues were not adequately addressed prior to the relicensing. The Commission had elected to defer consideration of the problem of anadromous fish migration—especially the lack of facilities for juvenile fish to migrate downstream

---

**12.** In *Pacific Gas,* 746 F.2d at 1386, we noted that "the limits of FERC Rule 217 are relatively untested in the courts." However, "[a]s long as the agency has considered all the relevant factors and has rationally exercised its discretion in deciding matters of law in which it has special competence, we see no reason to disturb the Commission's conclusions." *Id.*

**13.** *Cf. Bluestone Energy Design, Inc. v. FERC,* 74 F.3d 1288, 1292 (D.C.Cir.1996) (stating that the Commission's interpretations of its own regulations should be afforded substan-

tial deference, "unless its interpretation is plainly erroneous or inconsistent with the regulation") (internal quotations omitted). Here, under the plain language of Rule 217, the Commission appears to have violated its own regulatory standard for summary disposition. *See also Confederated Tribes,* 746 F.2d at 474 (setting aside an order granting a hydropower license in part because the FERC had violated its own regulations by issuing the license before the licensee had submitted a required report on the effect of the dam on fish and wildlife).

past the dam—pending its resolution in a parallel proceeding involving four other dams in the region. We granted the petition and set aside the license, stating that "[w]hile we are sympathetic with FERC's stated practical desire to resolve the fishery questions in a comprehensive proceeding covering all five of the Mid–Columbia Dams, we hold that the statutes require FERC to examine fishery issues before issuance of a license." *Id.; cf. Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC,* 876 F.2d 109 (D.C.Cir.1989) (finding that the Commission had abused its discretion in failing to undertake any form of environmental assessment prior to issuing annual licenses to operators of a number of hydroelectric projects along the Platte River, and rejecting as inadequate FERC's promise to address the issue on relicensing).

As a practical matter, we agree with the petitioners that relying on this flawed legal basis summarily to dispose of the complaint could also unfairly impact the relicensing negotiations; by not being held accountable for existing License violations, Tacoma could leverage the need for mitigation of such alleged infractions to gain concessions in the relicensing process. In addition, relicensing often takes many years, during which time damage to fish stocks would go unabated. A failure to issue a remedial order could therefore bear on the project for an extended time period. In sum, although a deferral to the relicensing process might constitute a legitimate reason for the Commission to de-

cline to bring an enforcement action in this case,[14] it does not constitute a valid legal basis for summarily disposing of a complaint alleging violations of an existing license.

For all these reasons, we find that the Commission erred in summarily dismissing the complaint.[15]

2. *Did the Commission abuse its discretion in failing to bring an enforcement action against Tacoma for violating the license?*

Even though we find that the FERC summarily disposed of the petitioners' complaint on an erroneous legal basis, we are mindful of the fact that as a general rule, the Supreme Court has held that "an agency's decision not to take enforcement action should be presumed immune from judicial review under [APA] § 701(a)(2)." *Chaney,* 470 U.S. at 832, 105 S.Ct. 1649. Indeed, inasmuch as the petitioners cannot compel the FERC to enforce any license violations that may be occurring in the first place, we find this consideration to be dispositive for purposes of this case.[16]

In contrast to affirmative agency actions which are subject to the application of meaningful standards of review, *see, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), decisions not to enforce are typically committed to the agency's absolute discretion, such that "a court would have no meaningful standard against which to judge the agency's exer-

---

**14.** *See* discussion, *infra.*

**15.** Although we ultimately deny the petition in light of the FERC's unreviewable discretion to enforce any alleged violations, *see infra,* our conclusion that the Commission erred in summarily dismissing the petitioners' complaint is not purely academic, given the fact that in reviewing relicensing applications the Commission is required to take into consideration

an "existing licensee's record of compliance with the terms and conditions of the existing license." 16 U.S.C. § 808(a)(3)(A) (2000).

**16.** Tellingly, even the petitioners acknowledge in their reply brief that "this appeal would be different if the Commission had investigated and made findings on the complaint's allegations, yet declined to take enforcement action."

cise of discretion." *Chaney,* 470 U.S. at 830–31, 105 S.Ct. 1649. As such, the Court likened such decisions to the choice of a prosecutor not to indict, and noted that they necessarily involve a "complicated balancing of a number of factors which are peculiarly within its expertise," such as where to allocate agency resources and whether the agency is likely to succeed in its enforcement action. *Id.* at 831–32, 105 S.Ct. 1649; *cf. Alaska Fish and Wildlife,* 829 F.2d at 938 (refusing to review the U.S. Fish and Wildlife Service's decision not to enforce the closed hunting season for migratory birds in Alaska, on the ground that "[t]he discretion granted to the Fish and Wildlife Service precludes our review of the Service's failure to enforce the [Migratory Bird Treaty Act]").

To be sure, the *Chaney* Court also "emphasize[d] that the decision [not to enforce] is only presumptively unreviewable; the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* at 832–33, 105 S.Ct. 1649. For example, "Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Id.*

However, an examination of the relevant provisions of the FPA reveals no such establishment of priorities or meaningful guidelines. Under 16 U.S.C.A. § 823b(a) (West Supp.2000), "[a]fter notice and opportunity for public hearing, the Commission may issue such orders as necessary to require compliance with the terms and conditions of licenses and permits issued under this subchapter...." This provision definitively affords the Commission wide latitude in its enforcement decisions. Accordingly, we hold that pursuant to *Chaney,* even if the Commission found that

Tacoma had violated the License by inadequately cooperating with WDFW to preserve fish stocks, it could lawfully decline to prosecute any such violations, and that such a decision would be immune from judicial review. *Cf. Industrial Cogenerators v. FERC,* 47 F.3d 1231 (D.C.Cir.1995) (holding that the court lacked jurisdiction to review the FERC's decision not to bring an enforcement action under the Public Utility Regulatory Policies Act).

Thus, even in light of our finding that the legal basis for the Commission's summary disposition of the complaint was in error, we hold that we lack authority to compel the Commission to enforce the terms of the License.

*3. Did the Commission abuse its discretion in failing to investigate the petitioners' complaint against Tacoma or hold an evidentiary hearing?*

For similar reasons, we also hold that the FERC did not abuse its discretion in declining to investigate the petitioners' allegations or hold an evidentiary hearing. With respect to the former, the relevant statutory provision comes from § 31(a) of the FPA:

> The Commission *shall* monitor and investigate compliance with each license and permit issued under this subchapter.... The Commission shall conduct such investigations *as may be necessary and proper* in accordance with this chapter. After notice and opportunity for public hearing, the Commission *may* issue such orders as necessary to require compliance with the terms and conditions of licenses and permits issued under this subchapter....

16 U.S.C.A. § 823b(a) (West Supp.2000) (emphases added).

The petitioners contend that this provision obligates the Commission to investigate complaints of noncompliance. How-

**1172**

ever, in addition to the equivocal language quoted above, 16 U.S.C. § 825f plainly states that the Commission "*may* investigate any facts, conditions, practices, or matters *which it may find necessary or proper* in order to determine whether any person has violated or is about to violate any provision of this chapter or any rule, regulation, or order thereunder, or to aid in the enforcement of the provisions of this chapter...." Thus, we find that under the plain language of the statute, investigative decisions are firmly committed to the agency's discretion.

Furthermore, under the applicable regulations, FERC decisions to investigate (or not investigate) are even more clearly committed to the agency's discretion. Under 18 C.F.R. § 1b.5 (2000), "[t]he Commission may, in its discretion, initiate a formal investigation by issuing an Order of Investigation." Likewise, pursuant to § 1b.6, "[t]he Commission or its staff may, in its discretion initiate a preliminary investigation.... Where it appears from the preliminary investigation that a formal investigation is appropriate, the staff will so recommend to the Commission." Finally, under § 1b.7, "[w]here it appears that there has been or may be a violation of any of the provisions of the acts administered by the Commission or the rules, opinions, or orders thereunder, the Commission may institute administrative proceedings ... or take other appropriate action."

■ Accordingly, we find that the FERC's decision not to investigate the alleged violations of Tacoma's license was within the Commission's discretion and is therefore unreviewable by this court. *See General Motors Corp. v. FERC*, 613 F.2d 939, 944 (D.C.Cir.1979) ("In general, an administrative agency's decision to conduct or not to conduct an investigation is committed to the agency's discretion.... If an agency considers all the relevant factors so that a court can satisfy itself that

the agency has actually exercised its discretion, an agency's decision to refrain from investigating is unreviewable.") (internal citations omitted); *cf. City of Chicago v. United States*, 396 U.S. 162, 165–66, 90 S.Ct. 309, 24 L.Ed.2d 340 (1969) (affirming the general principle that agency decisions to investigate are discretionary and unreviewable, but also holding that under the Interstate Commerce Act, decisions of the Interstate Commerce Commission to discontinue investigations that had already begun were subject to judicial review). In light of the Commission's stated preference for deferring consideration of alleged license infractions until the relicensing process, we are satisfied that the Commission "considered all the relevant factors" and lawfully exercised its discretion to refrain from investigating at this time.

■ Similarly, we find that the Commission lawfully exercised its broad discretion with respect to holding evidentiary hearings. In *Sierra Assoc. for Envir. v. FERC*, 744 F.2d 661 (9th Cir.1984), we held that the Commission was not required to hold a trial-type hearing before granting a hydroelectric license. Citing *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), we noted that "we cannot lightly impose additional procedural requirements on agency decision making." *Sierra Assoc.*, 744 F.2d at 663. After examining the relevant FPA and APA provisions governing hearings, as well as the applicable FERC regulations, we concluded that given the extensive notice-and-comment procedures which preceded the granting of the license, "FERC's refusal to hold a trial-type hearing did not prevent it from considering all the factors necessary to the rational exercise of agency discretion." *Id.* at 664.

In *Pacific Gas & Elec. Co. v. FERC,* 746 F.2d 1383 (9th Cir.1984), we likewise held that the Commission did not err in refusing to hold an evidentiary hearing before ruling summarily on the interpretation of a contract for electricity transmission service. Again citing *Vermont Yankee,* we remarked that "[w]e must allow the FERC wide discretion in selecting its own procedures ... and must defer to the FERC interpretation of its own rules, unless the interpretation is plainly erroneous." *Pacific Gas & Elec.,* 746 F.2d at 1386. Finally, citing *Sierra Assoc.,* we also concluded that "[w]hether or not to grant a full trial-type hearing is a matter within agency discretion." *Id.* In sum, we were "satisfied that FERC properly addressed all the relevant factors in dispute and that a formal hearing was unnecessary for the Commission to reach its conclusion." *Id.; see also Wisconsin v. FERC,* 104 F.3d 462, 467–68 (D.C.Cir.1997) (holding that neither the APA nor the FERC regulations in 18 C.F.R. §§ 385.501 *et seq.* create an independent right to an evidentiary hearing, and that FERC "is required to hold hearings only when the disputed issues may not be resolved through an examination of written submissions") (internal quotations omitted); *Cerro Wire & Cable Co. v. FERC,* 677 F.2d 124, 128 (D.C.Cir.1982).

In sum, we conclude that the FERC did not abuse its discretion in failing to investigate or hold hearings on the petitioners' complaint.

## IV.

Although the FERC plainly erred in summarily dismissing the petitioners' complaint, we believe it is equally evident that the Commission has virtually unreviewable discretion whether to enforce any alleged license violations, as well as whether to investigate such allegations or to hold evi-

dentiary hearings. Accordingly, we deny the petition for review.

PETITION DENIED.