329 F.3d 700
 STATE OF CALIFORNIA, ex rel Bill LOCKYER, Attorney General, Petitioner,
The City of Santa Clara; Transmission Agency of Northern California (TANC); Northern California Power Agency, Petitioner-Intervenor,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
PG & E National Energy Group Holdings Corporation, Respondent-Intervenor.
Northern California Power Agency, Petitioner,
Transmission Agency Of Northern California, City of Santa Clara, City of Palo Alto, Modesto Irrigation District (MID), Petitioner-Intervenor,
v.
Federal Energy Regulatory Commission, Respondent,
Pacific Gas and Electric Company, National Energy Group, Respondent-Intervenor.
 No. 02-70336.
 No. 02-70578.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted February 10, 2003.
 Filed May 15, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Robert C. McDiarmid, Lisa G. Dowden, and Andrea G. Lonian, Spiegel & McDiarmid, Washington, D.C., for petitioner NCPA.
 Ken Alex, Supervising Deputy Attorney General, Oakland, California, for petitioner the State of California.
 Robert H. Solomon, Associate Solicitor, Federal Energy Regulatory Commission, for the respondent.
 Earle H. O'Donnell and Andrew B. Young, Dewey Ballantine, Washington, D.C., for the intervenor PG & E National Energy Group, LLC.
 On Petition for Review of an Order of the Federal Energy Regulatory Commission. FERC Nos. EC01-49-002, EC01-41-002.
 Before: SILVERMAN and GOULD, Circuit Judges, and WEINER,* Senior District Judge.
 OPINION
 GOULD, Circuit Judge:
 
 
 1
 This case involves a challenge to the Federal Energy Regulatory Commission's approval of a corporate reorganization of certain Pacific Gas & Electric Co. subsidiaries. The petitioners, the State of California and the Northern California Power Agency, contend that the restructuring was designed to shield assets worth millions of dollars from creditors. The petitioners raise procedural and substantive objections to the Commission's order approving the reorganization. The petitioners argue that the Commission provided inadequate notice of Pacific Gas & Electric's applications, provided inadequate opportunity for a hearing, and failed to conduct properly the "public interest" analysis mandated by § 230 of the Federal Power Act. We hold that (1) the Commission's Federal Register notice language adequately notified the public of the "essential attributes" of the corporate reorganization, even though the notice language did not disclose the applicant's motive in making the applications or how the applicant would benefit from the reorganization; (2) the Commission's expedited review process, in this case, did not deprive the petitioners of the opportunity to be heard within the meaning of the Federal Power Act or the Fifth Amendment's Due Process Clause; (3) even if the Commission failed to give the petitioners adequate opportunity for a hearing initially, the Commission cured any procedural defect by carefully considering all the evidence and arguments the petitioners offered in their petitions for rehearing and their motions to intervene; and (4) the Commission's decision that the corporate reorganization was consistent with the public interest was supported by substantial evidence and was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" because the Commission properly exercised its discretion to balance factors it deems relevant to the public's energy needs. We deny the petitions.
 
 
 2
 * In the summer of 2000, wholesale electricity prices soared in California. Electricity retailers such as Pacific Gas and Electric Company (PG & E) were unable to pass the increased wholesale power costs on to their customers because the California legislature had imposed a retail rate "freeze" as part of its attempt to restructure the California electricity market. As a result, PG & E incurred billions of dollars of debt. With a possible PG & E bankruptcy looming, three of PG & E's subsidiaries ("the NEG Companies") proposed a corporate reorganization to be consummated in two steps. First, two of the NEG Companies would reincorporate as Delaware corporations. Second, a new company — PG & E National Energy Group, LLC — would be created and interposed between PG & E Corporation and the NEG Companies. This second feature of the reorganization, which PG & E later described as "ring fencing" in its required Securities Exchange Commission disclosures, was intended to improve PG & E's credit rating. Petitioners claim that this was to be accomplished by shielding PG & E assets from creditors in any future bankruptcy proceeding. It was imperative that the reorganization be consummated as soon as possible, according to PG & E, or lenders would stop financing some PG & E entities. If lenders balked, it would threaten PG & E's plan to build new power plants in California and elsewhere — plants that were needed to increase the electricity supply.
 
 
 3
 Because the need was urgent, the NEG Companies sought expedited approval for the reorganization in two applications filed with the Federal Energy Regulatory Commission (FERC) in December 2000.[1] The NEG companies filed a first application on December 11, 2000. The Commission published notice of it in the Federal Register on December 19, 2000. The notice stated:
 
 
 4
 Take notice that on December 4, 2000, PG & E National Energy Group, Inc., PG & E Enterprises and PG & E Share holdings, Inc. tendered for filing, on behalf of themselves and their public utility subsidiaries, an application under Section 203 of the Federal Power Act seeking authorization for certain changes to the upstream ownership of their public utility subsidiaries following a proposed intra-corporate reorganization.
 
 
 5
 Comments on the first application were due on or before December 26, 2000 — seven days after notice was published.
 
 
 6
 The NEG Companies filed a second application on December 28, 2000. The Commission mailed notice of it to the California Governor's Office the same day. The Commission published notice of the application in the Federal Register on January 4, 2001. The notice stated:
 
 
 7
 Take notice that on December 28, 2000, PG & E National Energy Group, LLC (NEG LLC) and PG & E National Energy Group, Inc. (NEG) tendered for filing on behalf of themselves and their public utility subsidiaries, an application under Section 203 of the Federal Power Act seeking authorization for the transfer of all outstanding stock of NEG from PG & E Corporation to NEG LLC.
 
 
 8
 Comments were due on or before January 8, 2001 — four days after notice was published.
 
 
 9
 Having received no comments or motions to intervene, the Commission approved the NEG Companies' applications in two January 12, 2001, orders. The orders analyzed the proposed reorganization's effects on competition, rates, and regulation and concluded, over a dissent, "that the proposed transactions [are] consistent with the public interest." Hours after the Commission approved the applications, the proposed reorganization was consummated.
 
 
 10
 After learning of the Commission's approval, the State of California on January 19, 2001, filed a motion for late intervention and requested a hearing. The State urged that it had "very substantial interests in all aspects of the current energy issues involving the State, and with respect to any possible utility bankruptcy." The Northern California Power Agency (NCPA), a public agency that generates and transmits electricity, filed a motion for late intervention and requested a rehearing on February 7, 2001. NCPA stated that it was a creditor of PG & E affected by the transactions. Several other entities, not parties to this appeal, also sought late intervention.
 
 
 11
 The Commission on February 21, 2001, denied the requests for late intervention and rehearing, holding that it gave adequate notice and opportunity for hearing to members of the public, in light of the urgency of the NEG companies' request. In its February 21, 2001, order, the Commission considered, and rejected, the evidence and arguments offered by the State, NCPA, and other intervenors.
 
 
 12
 The State, NCPA, and other entities filed for rehearing of the Commission's February 21, 2001, order. The Commission on January 30, 2002, granted rehearing and permitted all the parties to intervene in the proceeding involving the change in upstream ownership (the second application). But the Commission denied the requests to intervene in the proceeding involving the Delaware reincorporations (the first application). The Commission stated:
 
 
 13
 For the reasons discussed in the February 21 Order, we find that all interested persons were provided reasonable notice and opportunity to comment in both the Docket Nos. EC01-41 and the EC01-49 proceedings. Nonetheless, in recognition of the special circumstances of the Docket No. EC01-49 proceeding, e.g., the shortened notice period that included a holiday weekend and claims from certain entities that they did not receive notice as required under section 203 of the [Federal Power Act], we will grant the late interventions ... in Docket No. EC01-49-000. We deny intervention in Docket No. EC01-41 because there has been no showing that reasonable notice was not provided in that proceeding.
 
 
 14
 The Commission also rejected the intervenors' substantive arguments:
 
 
 15
 With regard to the petitioners' substantive concerns on rehearing, the pleadings do not raise any new arguments. Therefore, we deny the requests for rehearing of our prior orders, and the request for vacatur of the EC01-49 Order, for the same reasons articulated in the February 21 Order.
 
 
 16
 The State and NCPA then petitioned us for review.
 
 II
 
 17
 At the outset, we must decide whether the Commission's notices describing NEG's applications, printed in the Federal Register, gave NCPA adequate notice of the essential attributes of the applications under the Fifth Amendment's Due Process Clause.[2] Constitutional due process[3] requires that notice be reasonably calculated to inform parties of proceedings that may directly and adversely affect their legally protected interests. Walker v. City of Hutchinson, 352 U.S. 112, 115, 77 S.Ct. 200, 1 L.Ed.2d 178 (1956). Publication in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance, except those who are legally entitled to personal notice.[4] Camp v. United States Bureau of Land Mgmt., 183 F.3d 1141, 1145 (9th Cir.1999); see also 44 U.S.C. § 1507 (providing that Federal Register publication generally "is sufficient to give notice of the contents of the document to a person subject to or affected by it"). We have held that an interested member of the public should be able to read the published notice of an application and understand the "essential attributes" of that application. Friends of Sierra R.R., Inc. v. ICC, 881 F.2d 663, 668 (9th Cir.1989) (quoting N. Alabama Express, Inc. v. United States, 585 F.2d 783, 789 (5th Cir.1978)). A member of the public should not have to guess the applicant's "true intent." Id.
 
 
 18
 Although it is settled that a Federal Register notice must disclose an applicant's "true intent," neither we nor our sister circuits have considered the meaning of those words. Must a Federal Register notice disclose an applicant's underlying motive or merely its immediate intention? NCPA argues that a Federal Register notice must disclose the applicant's underlying motive. It argues that the notice must disclose not only what the applicant proposes to do, but also what the applicant stands to gain from agency approval. Stated another way, NCPA apparently would require the notice to disclose why the applicant plans to do what it proposes to do. In NCPA's view, the Commission's Federal Register notice was insufficient in stating that NEG intended to change the "upstream ownership of their public utility subsidiaries following a proposed intra corporate reorganization" (what NEG planned to do). NCPA contends that the notice also was required to state that the underlying motive of the proposed transaction was to improve NEG's credit rating by reducing the likelihood that the assets of the NEG companies would be consolidated in any possible future bankruptcy proceeding (why NEG planned the reorganization).
 
 
 19
 We reject NCPA's view. A Federal Register notice is intended to alert the public to the general nature of a proposed action, not to delineate all the action's possible implications. A Federal Register notice must provide basic factual information about what an applicant proposes to do. It need not explain why the applicant proposes a course of action or speculate about the action's significance for others. If an entity requires more detailed information to determine whether, or to what extent, it may be affected by a proposed action, it is the entity's responsibility to seek out that information. City of New Martinsville, 1997 WL 115923, 78 F.E.R.C. ¶ 61,304, at 61,309 (1997).
 
 
 20
 Here, the Federal Register notice sufficiently described what NEG intended to do. The notice was not required to do more. Any interested member of the public — and especially a public utility that participates in a heavily regulated industry and claims to be a substantial creditor of an obviously financially troubled applicant — should have understood that NEG's "intra-corporate reorganization," involving a change in "upstream ownership," might have implications for creditors. If NCPA wanted more information than was provided by the Federal Register notices, NCPA should have obtained a copy of NEG's applications. It did not. We hold that the Federal Register notices were plainly sufficient to provide notice to all interested persons of the essential attributes of NEG's applications.
 
 III
 
 21
 We next decide whether the Commission gave the petitioners adequate opportunity for a hearing before approving NEG's applications on an expedited schedule. The State of California argues that the Commission's expedited approval of the NEG applications violated the State's statutory due process rights under § 203 of the Federal Power Act (FPA).[5] NCPA argues that the Commission's expedited approval violated NCPA's constitutional due process rights under the Fifth Amendment's Due Process Clause.[6]
 
 
 22
 The scope of the "opportunity for a hearing" protected by the FPA has parallels with the "opportunity to be heard" protected by the Fifth Amendment. In both statutory and constitutional due process cases we have relied on the same factors in determining what process is due: the importance of the private interests affected, the value of the claimed procedural safeguards, and the burdens on government of providing those safeguards (the so-called Mathews v. Eldridge factors. See Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). See City of Seattle v. FERC, 923 F.2d 713, 715 (9th Cir.1991) (holding that no hearing is required where FERC can decide as a matter of law); Pacific Gas & Elec. Co. v. FERC, 746 F.2d 1383, 1386 (9th Cir.1984) (holding that no hearing is required where there has been no showing that material facts are in dispute); Sierra Ass'n for Env't v. FERC, 744 F.2d 661, 664 (9th Cir.1984) (holding that no hearing was required when a party participated in notice-and-comment procedures and failed to point to specific disputed facts). For purposes of deciding both the constitutional and statutory due process claims[7] in this case, we conclude that it is appropriate to apply the three Mathews v. Eldridge[8] factors: [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
 
 
 23
 Mathews, 424 U.S. at 335, 96 S.Ct. 893; S. Calif. Edison Co., 307 F.3d at 807-08.
 
 
 24
 Here, the three Mathews v. Eldridge factors indicate that the Commission gave NCPA and the State of California adequate opportunity for a hearing before making its initial decision, even though the State had only about four days[9] to respond to the Commission's mailed notice, and NCPA had only seven days and four days to respond to the Commission's two Federal Register notices.
 
 
 25
 First, we consider the private interest affected by the government action. Mathews, 424 U.S. at 335, 96 S.Ct. 893. The petitioners argue that the private interest affected is large and important, since the Commission's approval of the applications may have shielded millions of dollars from creditors. The petitioners overstate the significance of their interests. When the Commission established the notice periods in December 2000, the Commission's approval of the applications would have meant a loss for NCPA only if three future conditions were met: (1) if NEG declared bankruptcy; (2) if a bankruptcy court decided the transactions were not fraudulent; and (3) if the bankruptcy court approved a reorganization plan that did not repay petitioners in full. Unless these conditions were met, NCPA's interest as a creditor was secure. NCPA's interest in the transactions thus was speculative. The State's interest in the transactions is also speculative. The State mentions that it has "very substantial interests in all aspects of the current energy issues involving the State, and with respect to any possible utility bankruptcy." The State never specifies what those interests might be, and its general recital of interest does not suggest a need for heightened procedural protections.
 
 
 26
 Second, we consider the risk of an erroneous deprivation of the petitioners' interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards. Id. The Commission allowed only about four and seven days — relatively short time periods — for a response from the State and NCPA. These periods comprised federal holidays and a weekend. Nonetheless, under the circumstances, it does not seem that a longer comment period would have improved the Commission's decision making. Neither petitioner was close to meeting the deadline. The State and NCPA submitted their first pleadings eleven days and thirty days after the deadline expired. By their own admission, the petitioners did not consider filing motions to intervene until they read Commissioner Massey's dissent to the Commission's January 12, 2001, order. It thus appears that the petitioners might not have met even a later deadline. Moreover, the Commission reconfirmed in its January 30, 2002, order — more than a year after the applications and after much briefing by interested parties — that its original decision was the correct one. Presumably, it would have reached that same correct decision even if it had allowed a few more days for public comment.
 
 
 27
 Third, we consider the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. Id. Allowing additional time for a response presumably would have cost the Commission little in the way of administrative burdens. But, more importantly, it might have endangered the Commission's administrative mission by preventing it from acting to mitigate the growing California energy crisis. When the Commission received these applications, the commissioners believed they had to act quickly to help NEG secure a better credit rating and financing for subsidiaries. Quick action was crucial, the Commission later explained, so that NEG could continue to construct new power plants that were desperately needed in California. The Commission had a strong interest in reaching a conclusion at the earliest practicable time.
 
 
 28
 We assess due process case-by-case based on the total circumstances. Given the circumstances here, the Commission's expedited review of the applications did not deprive the petitioners of the opportunity to be heard, either under the Fifth Amendment's Due Process Clause or § 203 of the FPA.
 
 IV
 
 29
 Even assuming arguendo that the Commission initially deprived the petitioners of an opportunity for a hearing by approving the NEG applications after only a few days of public comment, the petitioners still would have no legal basis for complaint. In this case, the Commission provided all the procedural protections required by the Fifth Amendment and FPA when it carefully considered all the evidence and arguments that the petitioners offered in their petitions for rehearing and motions to intervene. See Parratt v. Taylor, 451 U.S. 527, 539, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) ("[T]he necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of due process."); Boston Edison Co. v. FERC, 885 F.2d 962, 966 (1st Cir.1989) (Breyer, J.) (suggesting that the Commission satisfies the dictates of due process by giving a person the opportunity fully to argue a matter in its petition for rehearing). See also City of Auburn v. United States, 154 F.3d 1025, 1028 (9th Cir.1998) (holding that an appeal was moot where a petitioner who was denied a hearing in one proceeding was able to raise its concerns in a separate petition for a declaratory order).
 
 
 30
 We reach this conclusion by applying the three Mathews v. Eldridge factors to the process by which the Commission considered the motions to intervene and petitions for rehearing in this case. As above, we consider the private interest affected, the risk of an erroneous deprivation through the procedures used, and the government's interest in its choice of procedure. Mathews, 424 U.S. at 335, 96 S.Ct. 893.
 
 
 31
 First, we consider the private interest affected by FERC's action. Id. Here, that interest — the petitioners' interest in ensuring full repayment of creditors should the bankruptcy court someday require less than full repayment — was speculative, as explained above.
 
 
 32
 Second, we consider the risk of an erroneous deprivation of the petitioners' interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards. Id. Here, there was little risk that FERC would erroneously deprive the petitioners of their interests by considering their evidence and arguments after its initial decision, rather than before it. Time was not of the essence for the petitioners (unlike for the Commission). The petitioners were not threatened by any imminent or irreparable injury. (Indeed, if the bankruptcy court in the future requires full repayment of creditors, it may appear that the petitioners were never injured.) That the Commission considered the petitioners' evidence and arguments after its initial decision, rather than before it, was of little practical consequence.
 
 
 33
 Moreover, the Commission's procedures for considering motions to intervene and petitions for rehearing allowed for thorough consideration of the petitioners' evidence and arguments. The Commission's procedural rules imposed upon the petitioners a duty to include in their motions for intervention and their petitions for rehearing a thorough statement of their objections, including their basis in fact and law. The Commission's Rule 214 provides that "[a]ny motion to intervene must state, to the extent known, the position taken by the movant and the basis in fact and law for that position." 18 C.F.R. § 385.214(b)(1). The Commission's Rule 713 provides that
 
 
 34
 [a]ny request for rehearing must: (1) State concisely the alleged error in the final decision or final order; (2) Conform to the requirements in Rule 203(a) which are applicable to pleadings; and (3) Set forth the matters relied upon by the party requesting rehearing, if rehearing is sought based on matters not available for consideration by the Commission at the time of the final decision or final order.
 
 
 35
 18 C.F.R. § 385.713(c).
 
 
 36
 The Commission admitted to the record whatever evidence the State, NCPA, and other intervenors submitted with their motions to intervene. And the Commission considered that evidence along with the intervenors' arguments. In its February 21, 2001, order, the Commission stated that it found "no merit in their arguments":
 
 
 37
 In their various pleadings, none of the commenters identify flaws in the Commission's analysis.... In the absence of any evidence to the contrary, we find that Applicants have adequately demonstrated that the reorganizations are consistent with the public interest.
 
 
 38
 In sum, the Commission fully considered the petitioners' evidence and arguments. The Commission at all times retained the authority to modify or set aside, in whole or part, its earlier order. 16 U.S.C. § 825l(a). We cannot say that the petitioners' interests would have been better protected had the Commission delayed its initial decision until it heard the petitioners's evidence and argument.[10]
 
 
 39
 Third, we consider the government's interest. Mathews, 424 U.S. at 335, 96 S.Ct. 893. As we explained above, the government's interest was strong, because delay might have endangered the Commission's administrative mission by preventing it from acting to mitigate the growing California energy crisis.
 
 
 40
 In light of the private interests affected, the small risk of erroneous deprivation through the procedures used, and the government's strong interest in expedient decision making, we hold that, under the circumstances of this case, the Commission's consideration of the petitioners' evidence and arguments in their motions to intervene and petitions for rehearing gave the petitioners all the procedural safeguards they were due under the Due Process Clause or the FPA.
 
 
 41
 Our holding today is consistent with our precedent. For example, in Sierra Association for Environment v. FERC, we held that the Commission was not required to hold a trial-type hearing because the Commission "in fact afforded a hearing" when it "carefully considered [the intervenor's written] submissions and responded to each of its comments." 744 F.2d 661, 663 (9th Cir.1984). Similarly, in Pacific Gas & Electric Co. v. FERC, we held that the Commission was not required to hold a trial-type hearing when "FERC was presented with highly technical legal analyses by all of the concerned parties[,]... [and] all the parties were afforded a full opportunity to respond in writing, to supply exhibits[,] and to present affidavits." 746 F.2d 1383, 1387 (9th Cir.1984). Moreover, our holding is consistent with the settled administrative law rules that the Commission has wide discretion to select its own procedures and that the Commission's decision not to hold a formal evidentiary hearing is a "virtually unreviewable" exercise of discretion. See Friends of the Cowlitz v. FERC, 253 F.3d 1161, 1173 (9th Cir.2001).[11]
 
 
 42
 We conclude that the petitioners were in fact afforded ample "hearing"[12] on their claims when the Commission considered the petitioners' evidence and arguments in their motions to intervene and petitions for rehearing.[13]
 
 V
 
 43
 Finally, NCPA challenges the Commission's decision on the merits, arguing that the Commission erred in concluding that the PG & E companies' reorganization was "consistent with the public interest." 16 U.S.C. § 824b(a).[14] NCPA argues that the Commission's factual findings were not supported by "substantial evidence" and that its legal decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." We reject these arguments.
 
 
 44
 First, NCPA argues that the Commission's factual findings were not supported by substantial evidence.[15] We disagree. The record contained evidence in the form of an affidavit by an NEG official reciting that ultimate control of the PG & E subsidiaries would not change as a result of the reorganization, that the rates the subsidiaries charged were market-based and would not change, and that the regulatory status of the PG & E entities would not change. A reasonable mind might accept these facts as adequate to support the conclusion that the PG & E reorganization was not harmful to the public interest. See Eichler, 757 F.2d at 1069. The Commission's decision was based on substantial evidence.[16]
 
 
 45
 Second, NCPA asserts that the Commission erred as a matter of law by "fail[ing] to consider or even discuss the consistency of the reorganization and transfer with the public interest."[17] It also asserts that the Commission "focus[ed] only on the activities of Applicants, and not at all on the effect of the transaction upon the collectability of billions of dollars of unpaid debts of their affiliate PG & E, and the effects of the removal of those assets backing transactions on the California markets in electricity." Both assertions are wrong. In its January 12, 2001, order, the Commission stated that "[a]fter consideration of the particular circumstances presented in this application, it is concluded that the proposed transaction is consistent with the public interest...." In addition, the Commission considered the effects of the reorganization on competition, rates, and regulation. In its February 21, 2001, order, the Commission amplified its earlier analysis, this time noting the transactions' effects on creditors and their bearing on the public interest:
 
 
 46
 [T]here is only speculation that the transaction will increase the possibility of non-payment by PG & E and deter non-affiliate suppliers from selling power to PG & E, thus resulting in diminished power supplies in California. On the contrary, by improving the ability of the NEG companies to obtain higher credit ratings, the reorganization may increase the likelihood that lenders will finance PG & E's electric generation construction projects in California. On balance, to the extent the applications enhance PG & E's ability to construct new generation, we would view the construction of more generation in California to be pro-competitive and consistent with the public interest.
 
 
 47
 The Commission's order contradicts NCPA's assertions that the Commission failed to consider the public interest and failed to consider the reorganization's effects on creditors. The Commission considered the reorganization's effects on energy markets and creditors and decided, on balance, that the reorganization was consistent with the public interest, based on the relevant factors. Balancing potentially conflicting factors relevant to the public's energy needs is a task for the Commission's discretion that we hesitate to second-guess.
 
 
 48
 We conclude that the Commission's decision was supported by substantial evidence and that it was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."
 
 
 49
 PETITIONS DENIED.
 
 
 
 Notes:
 
 
 *
 The Honorable Charles R. Weiner, Senior United States District Judge for the District of Eastern Pennsylvania, sitting by designation
 
 
 [1]
 The NEG Companies sought the Commission's approval of the transactions because the Federal Power Act requires Commission approval before a public utility transfers certain assets. Under § 203 of the Federal Power Act,
 No public utility shall sell, lease, or otherwise dispose of the whole of its facilities subject to the jurisdiction of the Commission, or any part thereof of a value in excess of $50,000, or by means whatsoever, directly or indirectly, merge or consolidate such facilities or any part thereof with those of any other person, or purchase, acquire, or take any security of any other public utility, without first having secured an order of the Commission authorizing it to do so.
 16 U.S.C. § 824b(a). Intervenor PG & E National Energy Group, LLC, states that there is a "substantial question" whether intra-corporate reorganizations that do not change the ultimate ownership or control of public utility subsidiaries and their jurisdictional facilities fall within the scope of § 203. It states that, "[d]ue to the need for expedited action, the applicants did not contest the Commission's jurisdiction under Section 203 over the NEG Reorganization or the Reincorporation." We need not and do not consider whether § 203 covers the reorganization at issue here.
 
 
 [2]
 Though the issue is not free from doubt, the petitioners have shown sufficient "actual or imminent" injury caused by the Commission's action to possess standing under the Constitution's Article IIISee Lujan v. Defenders of Wildlife, 504 U.S. 555, 562, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).
 
 
 [3]
 We assume, without deciding, that NCPA is entitled to the protections of the Fifth Amendment's Due Process Clause even though NCPA is a quasi-public agency and not a private individual. We also assume, without deciding, that NCPA was deprived of a liberty or property interest within the Amendment's meaning. We express no opinion on these issues
 
 
 [4]
 NCPA does not claim it was legally entitled to personal notice. The State of California, however, was legally entitled to personal notice. Section 203 of the Federal Power Act states that "[u]pon application for [approval of a transaction within the Commission's jurisdiction,] the Commission shall give reasonable notice in writing to the Governor and State commission of each of the States in which the physical property affected, or any part thereof, is situated...." 16 U.S.C. § 824b(a). California now claims that California Governor Gray Davis's office did not receive this notice. However, the record contains an affidavit from the Commission Secretary stating that he "prepared, and submitted for delivery by first class mail" the required notices on December 28, 2000. Moreover, the record shows that the California Public Utilities Commission received its notice from the Commission on January 4, 2001. Based on this substantial evidence, the Commission concluded that the Secretary mailed the required notice to the Governor, and we are bound by that finding. 16 U.S.C. § 825l(b) (stating that "finding[s] of the Commission as to the facts, if supported by substantial evidence, shall be conclusive"). The Commission's mailing of the notice satisfied the requirement of § 203See Josephine Weigner v. City of New York, 852 F.2d 646, 650 (2d Cir.1988) ("Though the mails are not one hundred percent reliable, none of these cases requires actual receipt of notice that is properly mailed.").
 
 
 [5]
 The FPA's § 203 requires the Commission to provide "notice and opportunity for hearing" before approving a proposed transaction. 16 U.S.C. § 824b(a)
 
 
 [6]
 Constitutional due process requires that a party affected by government action be given "the opportunity to be heard at a meaningful time and in a meaningful manner."Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (internal quotation marks and citations omitted). No party has contended that FERC's approval of the application was a formal adjudication for which the Administrative Procedures Act automatically required a trial-type hearing. We do not consider that possibility.
 
 
 [7]
 Our approach is supported by the Supreme Court's rule of statutory construction that "where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed."Carter v. United States, 530 U.S. 255, 264, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000) (quoting Morissette v. United States, 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952)). We think Congress had in mind the "cluster of ideas" associated with the Fifth Amendment due process opportunity for a hearing when it enacted the FPA's "opportunity for a hearing" requirement. See 16 U.S.C. § 824b(a).
 
 
 [8]
 The Supreme Court'sMathews v. Eldridge balancing test has "become the standard for determining whether certain challenged administrative procedures comply with the requirements of due process." Girard v. Klopfenstein, 930 F.2d 738, 742 (9th Cir.1991). Although the Supreme Court in Mathews did not announce an "all-embracing test for deciding due process claims," Dusenbery v. United States, 534 U.S. 161, 168, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002) (emphasis added), the Court did announce a general test that applies in all but a few contexts. See Parham v. J.R., 442 U.S. 584, 599, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) (calling the Mathews v. Eldridge test "a general approach for testing challenged state procedures under a due process claim"); Mathews, 424 U.S. at 335, 96 S.Ct. 893 (noting that "our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors") (emphasis added).
 The Court has used the Mathews v. Eldridge analysis to determine the procedures required by due process in many different contexts: to evaluate a state's ex parte attachment of real estate, Connecticut v. Doehr, 501 U.S. 1, 11, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991); to evaluate a Veterans' Administration rule regarding payment of counsel, Walters v. Nat'l Ass'n of Radiation Survivors, 473 U.S. 305, 320, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985); to evaluate a school district's process for firing employees, Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 543, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); to evaluate the standard of proof for involuntary civil commitment to mental hospitals, Addington v. Texas, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); to evaluate a state's failure to appoint counsel for indigent parents in state parental rights termination proceedings, Lassiter v. Dep't of Soc. Servs. of Durham County, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981); to evaluate the standard of proof in state parental rights termination proceedings, Santosky v. Kramer, 455 U.S. 745, 758, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); to evaluate rules governing payment for blood tests in paternity suits, Little v. Streater, 452 U.S. 1, 13, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981); to evaluate a statute that provided for suspension of drunk drivers' licenses, Mackey v. Montrym, 443 U.S. 1, 10, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979); and to evaluate a student's dismissal from a public university's medical school, Bd. of Curators of the Univ. of Mo. v. Horowitz, 435 U.S. 78, 86 n. 3, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). By contrast, the Court has used due process analyses different from the Mathews v. Eldridge analysis in only a few specific contexts: to evaluate military procedures, Weiss v. United States, 510 U.S. 163, 177, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994); to evaluate procedures in state criminal prosecutions, Medina v. California, 505 U.S. 437, 443, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992); and to evaluate the adequacy of notice, Dusenbery, 534 U.S. at 168, 122 S.Ct. 694. We conclude that the Mathews v. Eldridge analysis is applicable here, where NCPA alleges the Commission deprived it of due process interests without the opportunity for a hearing. This case does not arise in any of the exceptional categories in which the Supreme Court has held the Mathews v. Eldridge analysis does not apply. Moreover, the Mathews v. Eldridge analysis is well-suited to evaluating the appropriateness of the Commission's procedures, since "[t]he Mathews balancing test was first conceived to address due process claims arising in the context of administrative law." Medina, 505 U.S. at 444, 112 S.Ct. 2572. Indeed, we have explicitly relied upon Mathews v. Eldridge when examining Commission action in the past. See, e.g., S. Calif. Edison Co. v. Lynch, 307 F.3d 794, 807-08 (9th Cir.2002).
 
 
 [9]
 The Commission Secretary mailed notice to the State on December 28, 2000. Although the State has introduced no evidence of when it received the notice, it seems likely it arrived on January 4, 2001, the date the California Public Utilities Commission received its notice. Comments and motions to intervene were due on January 8, 2001, four days later
 
 
 [10]
 Although the petitioners may wish they had proffered more evidence or argued the merits more forcefully, they cannot claim they had no opportunity to do soSee Market St. Ry. Co. v. RR. Comm'n of Cal., 324 U.S. 548, 559, 65 S.Ct. 770, 89 L.Ed. 1171 (1945) ("[E]ven if a more convincing showing were made that the Company had relevant evidence to be heard, we find no adequate excuse for the failure to offer it in the proceeding.... A misapprehension by a litigant of the steps which its best interests require during a trial may be appealing grounds for a plea to the discretion of the hearing tribunal for another chance, but it is not grounds for our interference as a denial of constitutional rights.").
 
 
 [11]
 We recognize that in many circumstances — most notably criminal trials — the right to present evidence and arguments at an oral hearing before the decision-maker is fundamental and cannot be abridgedSee, e.g., Herring v. New York, 422 U.S. 853, 858, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975) (Stewart, J.) (holding that "counsel for the defense has a right to make a closing summation to the jury, no matter how strong the case for the prosecution may appear to the presiding judge").
 
 
 [12]
 As Judge Henry J. Friendly noted, the word "hearing" may be a "verbal coat of too many colors." Henry J. Friendly, "Some Kind of Hearing," 123 U. Pa. L.Rev. 1267, 1270 (1975). "Although the term `hearing' has an oral connotation," Judge Friendly wrote, "I see no reason why in some circumstances a `hearing' may not be had on written materials only." Id.
 
 
 [13]
 NCPA advances two additional procedural arguments that we can reject with little comment. First, we reject NCPA's argument that the Commission was required to comply with the Administrative Procedures Act's notice-and-comment procedural requirements applicable to agency rulemaking, for precedent is contrarySee United States v. Fla. E. Coast Ry. Co., 410 U.S. 224, 245, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973). Second, we reject NCPA's argument that the Commission abused its discretion by not permitting NCPA to intervene late in Docket EC01-41. The Commission determined that NCPA did not have "good cause" for failing to file a timely motion, and it applied the appropriate regulatory standard. See 18 C.F.R. § 385.214(d). NCPA also has filed a motion requesting us to notice certain documents. The motion is denied. See Rybachek v. EPA, 904 F.2d 1276, 1296 (9th Cir.1990) ("Judicial review of agency actions should generally be confined to the original record upon which the actions were based.").
 
 
 [14]
 Under the FPA, the Commission "shall approve" applications "if the Commission finds that the proposed disposition, consolidation, acquisition, or control will be consistent with the public interest." 16 U.S.C. § 824b(a). The proposed transaction need not positively benefit the public interest; it need only be "consistent" with itSee Wabash Valley Power Ass'n v. FERC, 268 F.3d 1105, 1115-16 (D.C.Cir.2001). In determining whether a proposed transaction subject to § 824b(a) is consistent with the public interest, the Commission will generally consider three factors: (1) the effect on competition; (2) the effect on rates; and (3) the effect on regulation. 18 C.F.R. § 2.26(b). It may also consider other factors. Id. Of course, the Commission has discretion to consider as part of its public interest calculus the effect a proposed transaction will have on electricity generation.
 
 
 [15]
 The Commission's factual findings are conclusive if supported by "substantial evidence," 16 U.S.C. § 825l(b), meaning such relevant evidence as a reasonable mind might accept as adequate to support a conclusionEichler v. SEC, 757 F.2d 1066, 1069 (9th Cir.1985).
 
 
 [16]
 NCPA faults the Commission with "relying solely upon the misleading representations of Applicants in the application[s], in the absence of any actual evidence in the record to support its sweeping statements." What NCPA fails to recognize is that the NEG Companies' representations in the applicationsare "actual evidence in the record." The applications were verified by an NEG official, who swore that "I have read the foregoing Application and have knowledge of the matters set forth therein. The statements in said Application are true and correct to the best of my knowledge, information and belief." We decline to hold as a matter of law that facts developed from the testimony of one interested person cannot constitute substantial evidence.
 
 
 [17]
 We may set aside the Commission's legal conclusion that the PG & E reorganization was consistent with the public interest only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A)